# Title VI and Urban Indian Housing

The Department of Housing and Urban Development is not authorized by statute or regulation to provide tenant rental assistance to an urban housing program whose occupancy is limited to Indians, and such assistance to a program with a racially or ethnically exclusive tenant policy is affirmatively prohibited by Titles VI and VIII of the Civil Rights Act of 1964 and by the Fifth Amendment.

Legislation affecting Indians should be construed in their interest; however, if Congress does not explicitly single out Indians for preferential treatment, courts should not imply an intent to treat Indians more favorably or differently from all other citizens.

While Congress has approved special aid for Indians in connection with housing on reservations and Indian areas, neither the Housing Act of 1937 nor long-settled and congressionally ratified administrative practice under that Act sanction off-reservation Indian housing preferences which would otherwise violate statutory or constitutional nondiscrimination requirements

June 8, 1982

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS DIVISION

This responds to your request for our opinion whether the Department of Housing and Urban Development (HUD) may make available federal funds for a 24-unit scattered site, detached rental housing program open only to Indians residing in St. Paul, Minnesota. You ask specifically whether federal funding for tenant rental assistance pursuant to HUD's Section 8 Moderate Rehabilitation Program, 42 U.S.C. § 1437f (hereinafter Section 8); 24 C.F.R. § 882 (1982), under the United States Housing Act of 1937, 42 U.S.C. § 1437 (hereinafter Housing Act), is permissible in light of the nondiscrimination requirements that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631, imposed on recipients of federal financial assistance.

In the course of considering the various issues raised by this particular plan, we have identified a threshold legal issue which, as we have resolved it, is necessary to the disposition of the matter. That issue is whether the Secretary of HUD has discretion under Section 8 to make funds available to an off-reservation housing project that conditions tenant eligibility on at least one-fourth Indian blood, as determined by tribal membership. Once this question is resolved, the Title VI issue is considerably simplified. For reasons stated below, we conclude, first, that

although Congress expressed an intent to assist Indians under the Housing Act, it did not indicate that special treatment of Indians was to extend beyond Indian reservations and Indian areas. Second, nothing in Section 8 of the Housing Act or its accompanying regulations authorizes HUD to provide tenant rental assistance under its Moderate Rehabilitation Program to an urban housing program available only to Indians. Thus, absent express congressional approval for, or administrative acceptance of, off-reservation Indian-only Section 8 housing, Titles VI and VIII and the Fifth Amendment prohibit federal assistance for a program with a racially or ethnically exclusive tenant policy. An affirmative legislative intent to aid urban Indian housing or to treat urban Indians specially would, of course, alter the Title VI, Title VIII, and constitutional analysis. *See Fullilove* v. *Klutznick,* 448 U.S. 448, 492 n.77 (1980) (later, specific preference provision supersedes earlier, general nondiscrimination statute); *Morton* v. *Mancari,* 417 U.S. 535, 550–551 (1974) (specific statutory preference for Indians would supersede general nondiscrimination statute, regardless of the priority of enactment).

## I. Facts

As we understand the facts, the St. Paul Inter-Tribal Housing Board is a coalition of the four major Indian organizations serving St. Paul: the St. Paul American Indian Center; the Red School House, Inc.; the St. Paul American Indian Movement, Inc.; and the St. Paul Urban Indian Health Board Clinic. Three different Tribes are represented on its five-member Board of Directors. The Board has applied to be the nonprofit sponsor of 24 scattered sites, detached rental housing units of three and four bedrooms, for low-income Indian families. The contemplated sites are six central St. Paul neighborhoods with high Indian concentrations.[1] Only Indian families whose head of household has at least "one-quarter degree Indian blood, as verified by tribal enrollment," would be eligible for the housing.[2] The local Tribes have endorsed the Inter-Tribal Housing Board and its plans as fulfilling a need of their members.[3]

The Minnesota Housing Finance Agency would provide a 30-year no interest loan of $820,000 under the state's Urban Indian Housing Loan Program (UIHLP)

---

[1] We do not know whether these St. Paul Indians are tribal members or not We have not been asked, and therefore have not considered, whether locating the housing units in areas with high Indian concentration would be consistent with federal policies of integration in housing *See Hills* v *Gautreaux,* 425 U.S 284 (1976), *Otero* v *New York City Housing Authority,* 484 F 2d 1122, 1134 (2d Cir 1973), 24 C F R § 882 503(a)(9)(i) (objective of "deconcentration" for Section 8 program).

[2] This classification is similar to the Bureau of Indian Affairs employment preference at issue in *Morton* v *Mancari,* which required that an individual be "one-fourth or more degree Indian blood and be a member of a federally recognized tribe" 417 U S. at 553 n 24 The Supreme Court characterized that preference as follows:

> The preference is not directed towards a "racial" group consisting of "Indians"; instead, it applies only to members of "federally recognized" tribes. This operates to exclude many individuals who are racially to be classified as "Indians" In this sense, the preference is political rather than racial in nature

[3] Letter from Donna Follstad, Chairperson, Urban Indian Advisory Council, to Minnesota Housing Finance Agency Board Members (Mar 23, 1981), Resolution 15–81, Minnesota Sioux Tribe, Inc (Aug 19, 1981); U S.C Resolution 27–81, Upper Sioux Community (Aug 25, 1981)

to purchase the units. The UIHLP is apparently established pursuant to a state law that permits the State Housing Agency to "engage in housing programs for low and moderate income American Indians. . . ." Minn. Stat. Ann. § 462A.07(15) (West Supp. 1981).[4] A $360,000 low interest loan from the city and a private foundation would cover rehabilitation of the units. The purchase and rehabilitation loans have been obtained, contingent upon approval by HUD of Section 8 housing assistance payments.

HUD would provide tenant rental assistance to the St. Paul Public Housing Agency (PHA) on behalf of families who would then lease the units pursuant to the provisions of Section 8 of the Housing Act. 42 U.S.C. § 1437f; 24 C.F.R. § 882 (1981) (Section 8 Moderate Rehabilitation Program). To ensure that only Indians would benefit from the proposed project, the PHA would maintain a separate list of eligible Indian applicants for initial occupancy and vacancies as they occur. The basis for this Indian preference is the PHA's findings that the St. Paul American Indian population has not been well-served by the existing Section 8 program; that the state has been unsuccessful in implementing its Section 8 program, for which 75 units are allotted; and that the 24-unit project would enable the St. Paul Inter-Tribal Housing Board to make use of special state funds for urban Indians which have been largely unused.[5]

## II. Analysis: May HUD Provide Section 8 Moderate Rehabilitation Funds for a Program Conditioning Eligibility on Membership in an Indian Tribe?

### A. Section 8 and its Legislative History.

The Housing Act of 1937 is the basic statutory authority for low-income housing programs. Its provisions cover public housing projects, congregate housing for the displaced, elderly, or handicapped, and the Section 8 housing assistance program. 42 U.S.C. § 1437d, e, f. The Section 8 assistance program was developed by Congress in 1974 in an effort "to give private developers the

---

[4] Subdivision 15 of Minn. Stat Ann § 462A 07 provides in full:

It [the Housing Finance Agency] may engage in housing programs for low and moderate income American Indians as that term is defined in § 254A 02, subdivision 11, residing in the metropolitan area defined in § 473.121, subdivision 2, and cities with a population greater than 50,000 persons. The program shall demonstrate innovative methods of providing housing for urban Indians, may involve the construction, purchase and rehabilitation of residential housing, and may be administered through any other provision of this chapter. To the extent possible, the programs shall combine appropriated money with other money from both public and private sources. . . The agency shall consult with the advisory council on urban Indians created pursuant to § 3 922, subdivision 8, in the development of programs pursuant to this subdivision

Subdivision 14 of the same section states in pertinent part:

It [the Minn Housing Finance Agency] may engage in housing programs for low and moderate income American Indians      developed and administered separately or in combination by the Minnesota Chippewa tribe, the Red Lake band of Chippewa Indians, and the Sioux communities as determined by such tribe, band, or communities. In developing such housing programs the tribe, band, or communities shall take into account the housing needs of all American Indians residing both on and off reservations within the state.

[5] Letter to HUD from Marshall D. Anderson, Executive Director, PHA (Jan 23, 1981)

incentive for profit and the risk of loss in the construction and management of housing developed for low income families." S. Rep. No. 693, 93d Cong., 2d Sess. 43 (1974). Section 8 continued, in a substantially modified form, the leased housing assistance program Congress had enacted in 1965 to provide private accommodations for sublease to low-income families. S. Rep. No. 693, 93d Cong., 2d Sess. 43 (1974); H.R. Conf. Rep. No. 1279, 93d Cong., 2d Sess. 138 (1974); Housing and Community Development Act of 1974, Pub. L. No. 93–383, 88 Stat. 653, 662, 42 U.S.C. § 1437f.

Section 8 authorizes the payment of lower-income housing assistance "[f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing. . . ." 42 U.S.C. § 1437f(a). It empowers the Secretary "to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section." 42 U.S.C. § 1437f(b)(1). It also establishes limitations on the maximum monthly rent and the percentage of assistance allocated, for example, to very low-income families. See 42 U.S.C. § 1437f(c)(1)–(8).

For purposes of tenant selection, the relevant subsection of Section 8 provides:

(d)(1) Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that

(A) the selection of tenants for such unit shall be the function of the owner, subject to the provisions of the annual contributions contract between the Secretary and the agency,[6] except that the tenant selection criteria used by the owner shall give preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under this section.

42 U.S.C. § 1437f(d)(1)–(A).

On its face, this provision indicates only that preferences are permissible for "families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance. . . ." However, it also places the responsibility for selecting tenants on the owner, which suggests that an individual owner has some discretion to devise eligibility priorities on his own. Moreover, the exception mandating preferences for involuntarily displaced families is a recent 1979

---

6 The provisions of the annual contributions contract establish, *inter alia*:

(1) the maximum monthly rent which "shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically . . ."

(2) provisions for adjustment "annually or more frequently in the maximum monthly rents" that "reflect changes in the fair market rentals . . . or, if the Secretary determines, on the basis of a reasonable formula "

42 U.S.C. § 1437f(c)(1), (2)(A) Aside from the provision that "At least 30 per centum of the families assisted under this section with annual allocations of contract authority shall be very low-income families at the time of the initial renting of dwelling units," there is no express qualification, other than qualifying as a "lower income family," on *whom* an owner may select as tenants. 42 U S C § 1437f(c)(7), (f)(1).

amendment. See Pub. L. No. 96–153, § 206(b)(1), 93 Stat. 1101, 1108. Prior to 1979, Section 8 had simply provided that "the selection of tenants . . . shall be the function of the owner, subject to the provisions of the annual contributions contract between the Secretary and the agency." 42 U.S.C. § 1437f(d)(1)(A) (1976) (prior to 1979 amendment).

The legislative history accompanying the 1979 change explained the nature of the preference:

> The Committee has provided a priority in the selection of tenants in public housing and section 8 for families who occupy substandard housing or have been involuntarily displaced at the time they apply for assistance. The Committee believes that in a period of reduced funding for assisted housing, the programs should be directed toward those families who have housing needs which require more urgent attention. . . . The priority is not intended nor should it be used to allow the Department to direct an owner or PHA to select certain tenants. It would be unacceptable and clearly not authorized by this provision for the Department to require a PHA or owner to select tenants from a list developed by the Department. This provision is not intended to alter the basic responsibility over tenant selection which, under current law, rests solely with the PHA and owner. It is simply intended to have owners and PHAs give priority to meeting the urgent housing needs of those families living in substandard conditions or being involuntarily displaced.

H.R. Rep. No. 154, 96th Cong., 1st Sess. 16 (1979); Housing and Community Development Amendments of 1979, Pub. L. No. 96–153, 93 Stat. 1101. Section 8 and its legislative history offer no additional guidance on the rationales behind, and the permissibility of, tenant preferences.

## B. Rules of Statutory Construction Relative to Legislation Affecting Indians.

Section 8 and its legislative history give no clear indication of the extent of discretion that a PHA or owner may exercise in selecting tenants and, more specifically, whether an Indian preference is permissible. The answers to these questions must be evaluated in light of two rules of statutory interpretation relevant to statutes that arguably affect the legal rights of Indians. One is the familiar rule that "legislation affecting the Indians is to be construed in their interest and a purpose to make a radical departure is not lightly to be inferred." *United States* v. *Nice*, 241 U.S. 591, 599 (1916). This policy of generously construing any ambiguities in favor of Indians would be applicable if either language in the Housing Act generally, or Section 8 interpreted in light of administrative practice, indicated an intention to permit an Indian housing preference in the present circumstances.

However, a second rule of statutory construction prescribes that if Congress does not explicitly single out Indians for preferential treatment, courts should not imply an intent to treat Indians more favorably or differently from all other citizens. The Supreme Court has often noted that if Congress intends to aid or protect Indians in a manner different from others, "it should say so in plain words. Such a conclusion cannot rest on dubious inferences." *Oklahoma Tax Comm'n* v. *United States*, 319 U.S. 598, 607 (1943) (no express intent to exempt restricted Indian lands from state estate taxation); *F.P.C.* v. *Tuscarora Indian Nation*, 362 U.S. 99, 117 (1960) (no intent to exempt Indian reservations beyond those specially defined in the statute). Thus, if further scrutiny reveals an absence of legislative intent to treat specially off-reservation Indian housing programs, there is no basis for inferring preferential treatment simply because Indians have been favored in some other context. Faced with congressional silence, we could not find that Indians, simply by being Indians, should be excluded from the legislative and administrative rules that generally govern Section 8 housing programs. *See F.P.C.* v. *Tuscarora Indian Nation*, 362 U.S. at 116.

Third, unless the Housing Act of 1937 contains an Indian preference, to infer that Congress intended to exempt Indians from the general requirements of the nondiscrimination statutes that apply to federal housing assistance, without specifically indicating such an intent, would constitute a repeal by implication. Because Congress is presumed to be aware of the entire body of law, and thus aware of prior statutes when it enacts later ones, courts strongly disfavor any repeals by implication. *See Watt* v. *Alaska*, 451 U.S. 259, 267 (1981); *Morton* v. *Mancari*, 417 U.S. at 549; *Universal Interpretative Shuttle Corp.* v. *Washington Metropolitan Area Transit Comm'n*, 339 U.S. 186, 193 (1968).

As is well-known, § 601 of Title VI of the Civil Rights Act of 1964 provides that

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 more specifically bans discrimination in the sale or rental of housing "because of race, color, religion, sex or national origin." 42 U.S.C. § 3604. This prohibition applies to public housing authorities like the St. Paul agency involved here that receive federal financial assistance. 42 U.S.C. § 3603(a).

Were the Housing Act of 1937, or long-settled and congressionally ratified administrative practice thereunder, found to have sanctioned an Indian housing preference, then the subsequently enacted nondiscrimination statutes would not impliedly repeal such a specific preference. *See Radzanower* v. *Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum"); *Morton* v. *Mancari* (rejecting contention that Equal

Employment Opportunity Act impliedly repealed Indian preference provisions of Indian Reorganization Act). But if the 1937 Act was silent with respect to Indian preferences, converse presumptions apply. When Congress amended the Housing Act in 1974 to provide for Section 8 housing assistance, and in all subsequent amendments to Section 8, Congress was legislating against the backdrop of Titles VI and VIII. Presumably, if Congress intended to exempt Indians from the nondiscrimination statutes, it would make express its desire to modify or preclude the applicability of these existing statutes that would otherwise affect the later enactments. This is especially so when major public statutes reflecting important national policy, such as Titles VI and VIII, are involved. *See Watt v. Alaska,* 451 U.S. at 281 n.5 (Stewart, J., dissenting) ("it would be unreasonable to assume Congress would alter fundamental policy without an unambiguous expression of its intent to do so"); 1A, C. Sands, Sutherland on Statutory Construction § 23.10 (3d ed. 1972). Indeed, there is no question about Congress' awareness of Title VI: it expressly incorporated Title VI requirements into the housing regulations. *See* n.15 *infra.* Thus, if Congress had been previously silent concerning urban Indian housing, it would require an explicit Indian exemption or equivalent "clear and manifest" intent to effect a partial amendment of Title VI. *See United States v. Borden Co.,* 308 U.S. 188, 198 (1939).

## C. Application of Rules of Statutory Construction.

(1) Congress Did Not Intend to Permit an Indian Only Off-Reservation Section 8 Housing Program Under the Housing Act.

First, we must determine whether the Housing Act is legislation enacted for the benefit of Indians and therefore should be construed generously in their favor. We conclude that with respect to off-reservation housing the statute contains no evidence of an intent to treat Indians specially.

The Housing Act is a general statute and not legislation specifically designed to benefit Indians.[7] In the opening declaration of policy, the Housing Act states "[i]t is the policy of the United States to promote the general welfare of the nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income. . . ." 42 U.S.C. § 1437.

The Act refers explicitly to Indians on only two occasions. The primary reference to Indians is in a definition, rather than substantive, section of the Act.[8]

---

[7] *Cf.* The Bartlett Act, 42 U.S C § 3371 (assistance for housing for Alaskan natives) In *Eric v Sec'y of Housing and Urban Development,* 464 F. Supp 44 (D. Alaska 1978), the court held that the legislative history of the Bartlett Act indicated that an Indian preference was intended.

[8] The other reference appears in 42 U.S.C. § 1437d, which excepts projects on Indian reservations or in Alaskan Native villages from the general rules binding the Secretary in assessing prototype costs *See* p 15 *infra.* The 1974 Amendments had also contained a provision targeting funds to Indians for certain types of housing from 1974 to 1976 42 U S C § 1437c(c) *See* p 23 *infra.* After 1976, Congress did not make explicit reference to Indian funds in the Housing Act and the 1978 Housing and Community Development Amendments specifically rejected the concept of set-asides Congress concluded that "[d]eletion of the set-asides would provide the Secretary maximum flexibility in utilizing the funds made available for public housing and section 8 housing assistance payments " S Rep. No 871, 95th Cong., 2d Sess 14, 73 (1978).

Section 1437a provides that when used in this chapter "[t]he term 'State' includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, the Trust Territory of the Pacific Islands, and Indian Tribes, bands, groups, and Nations, including Alaska Indians, Aleuts, and Eskimos, of the United States." 42 U.S.C. § 1437a(7). No legislative history explains this 1974 amendment which included "Indian Tribes, bands, groups, and Nations" within the reach of the statute. Pub. L. No. 93–383, 88 Stat. 653; S. Rep. No. 693, 93d Cong., 2d Sess. 119 (1974).

We believe that the inclusion of Indians in this general definitional section, as opposed to a substantive section of the Act, suggests only that Congress intended to establish that HUD can have the same type of administrative relationship with Indian Tribes as it does with the states or the District of Columbia. *See Alexander v. U.S. Dept. of Housing & Urban Development*, 441 U.S. 39, 50–53 (1979) (short, general statement of purpose not intended to be substantive departure from Congress' statutory design). In treating Indian Tribes as essentially equivalent to political subdivisions, Congress would be dealing with Indians as members of quasi-sovereign tribal entities, not as individuals of a particular race.[9] This interpretation comports with the prevailing rationale underlying Congress' plenary power to legislate specially with respect to Indians: that Indians are a separate people with their own institutions. *See United States v. Antelope*, 430 U.S. 641, 646 (1977); *Morton v. Mancari*, 417 U.S. at 555.

That Congress intended by the Act to direct housing assistance exclusively to Indian Tribes only insofar as they functioned as governmental authorities with discrete jurisdictions is supported by earlier legislation and existing regulations. Prior to the 1974 Amendment which included "Indian Tribes, bands, groups . . ." within the categories of eligible recipients, Congress had infrequently addressed Indian housing problems. The initial 1937 legislation providing housing for low-income families did not specifically include Indians as beneficiaries of governmental largesse. *See* United States Housing Act of 1937, § 1, 50 Stat. 888, 42 U.S.C. § 1401. In 1968, Congress amended Section 1 of the Act by adding "Indian areas" to the previously designated urban and rural nonfarm areas targeted for federal assistance. Housing and Urban Development Act of 1968, § 206(a), 82 Stat. 504; 42 U.S.C. § 1401. This reference to "Indian

---

[9] The Senate Report to the Housing and Community Development Act of 1974 gave a more extensive definition of the Indian tribal groups which Congress intended to be eligible for planning assistance under an amendment to another housing statute, the Housing Act of 1954 Insofar as the amendment, similar to the amendment in § 1437a(7), redefined the list of eligible recipients, the description of Indian recipients is enlightening but not dispositive·

The amendments would, however, authorize the Secretary to make planning assistance available to *Indian tribal groups, or bodies which represent Indians living as a community and owning contiguous lands* for which planning assistance is sought, whether or not these tribal groups or Indians are eligible to receive grants under other Federal assistance programs. The term "Indian tribal group or body" is intended to mean any tribe, band or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 and those recognized by the State in which they reside and any tribe, band or groups of Eskimos, Aleuts, or Alaskan natives (emphasis added)

S Rep. No 693, 93d Cong , 2d Sess 60 (1974).

areas" was the predecessor of the 1974 Amendment that defined "Indian Tribes, bands, groups, and Nations," as potential recipients of assistance under the Act.

The legislative history explained the 1968 change which first mentioned Indians, as follows:

> Section 206 of the bill would amend the U.S. Housing Act of 1937 so as to permit public housing assistance for Indian families without regard to the present limitation which does not permit public housing programs to include a site which is on a farm or is an appurtenance to a farm. The existing limitation has presented difficulties in connection with conventional low-rent housing and mutual-help housing programs for Indians. . . . In some cases, the present limitation has the effect of permitting the use of certain sites, and prohibiting others, in connection with the same project on an Indian reservation. This amendment is intended to apply to all Indian reservations, whether they be State or National.

S. Rep. No. 1123, 90th Cong., 2d Sess. 32 (1968). By expressly stating that the amendment applied to Indian areas—which the legislative history described as reservations—Congress presumably intended to direct such federal aid that far but not necessarily any further.

The Supreme Court reached an analogous conclusion in *F.P.C.* v. *Tuscarora Indian Nation*, 362 U.S. 99, which presented the question whether lands owned by the Tuscarora Indian Nation could be taken, with just compensation, for the storage reservoir of a hydroelectric power project by the New York Power Authority under a license from the Federal Power Commission. The statute at issue exempted "reservations" *of the United States,* including "tribal lands embraced within Indian reservations," from the lands that could be condemned, if the taking would interfere with the purpose of the reservation. 362 U.S. at 112. Yet the Court held that lands *owned in fee simple by the Indian Nation* were "not within a 'reservation' as that term is defined and used in the [statute]." 362 U.S. at 115. The Court distinguished the extent to which Congress dealt specially with Indians—excluding tribal lands within federally owned reservations from the statute's scope—and the extent to which Congress "intended to include lands owned or occupied by any person or persons, including Indians . . ." within the takings power of the statute. 362 U.S. at 118.

Interpreting Congress' intent in the Housing Act to limit special aid to Indians to Indian areas[10] is further supported by a recent amendment to the Act. Section 1437d(b)—the other express statutory reference to Indians—excepts "projects to be constructed as a result of assistance provided under this chapter and which are to be located on Indian reservations or in Alaskan Native villages" from the general rules that bind the Secretary's determination of prototype costs. The

---

[10] "Indian areas" is a term of art used both in the 1968 Housing Act and in existing regulations. 24 C.F.R. § 805.102 (1981). Essentially coterminous with the word "reservation," the word is also intended to include the similarly owned Indian lands that cover large sections of Oklahoma and Indian areas in Alaska, neither of which fall technically within the term "reservation."

subsection notes that "with respect to remote areas such as may be found in connection with projects developed under the Indian and Alaskan Native housing program assisted under this chapter, the extensive transportation required to provide the necessary labor, materials, and equipment to the project site and any additional conditions that the Secretary determines should be taken into consideration . . ." shall be accounted for in determining the prototype costs. 42 U.S.C. § 1437d(b)(8). The statutory language implies that Indian program assistance is targeted to Indian lands which may not be well-integrated into the state's transportation network or which simply may be remote from sources of materials, equipment, and supplies. Nowhere is there a congressional indication that the Indian program is operative in the cities, for Congress most likely found no reason to differentiate Indians from other citizens in urban areas.

(2) HUD Regulations Supply no Suggestion of Legislative Intent to Treat Off-Reservation Indians Specially.

The HUD regulations that define the Indian Housing Program under the Housing Act also buttress the conclusion that no special treatment of Indians was intended outside Indian areas. The Indian housing regulations set forth at 24 C.F.R. § 805 (1981) are applicable "to such projects which are developed or operated by an Indian Housing Authority [(IHA)] *in the area* within which such Indian Housing Authority is authorized to operate" (emphasis added). 24 C.F.R. § 805.101(a)(1). If the IHA is established by a tribal ordinance enacted "by exercise of a tribe's powers of self-government," it operates over "all areas within the jurisdiction of the tribe." 24 C.F.R. § 805.108(a); App. 1 (tribal ordinance). If the IHA is established pursuant to a state law, it must have "all necessary legal powers to carry out low income housing projects for Indians." 24 C.F.R. § 805.108(b).[11] *That is, even an IHA created by state law must function as a governing body with respect to housing matters within a particular region or area.*[12]

---

[11] Alaska, Maine, Oklahoma, and Texas have enacted laws to permit the establishment of IHAs to provide housing in Indian areas in those states *See, e.g* , 63 Okla. Stat Ann. § 1054. As the HUD Interim Indian Housing Handbook 7440-1, *amended* 1979, explains, "[a] public housing agency which serves Indians as well as other low income families is not eligible as an IHA since the statute creating such as authority is not a statute providing specifically for housing authorities for Indians." Chapt. I-1(C) at 1-3

[12] In addition, HUD indicated that federal funds for Indian Housing projects were restricted to Indian areas when it first published its Indian housing regulations in 1976. HUD explained the possibility of Section 8 housing as follows·

Several comments objected to the mention of the Section 8 Housing Assistance Payments program as a type of housing available to IHAs. While the Section 8 Program has not yet been utilized in Indian areas, HUD has not ruled out the possibility of providing this type of housing assistance as beneficial to Indians because it is possible to provide homeownership opportunity housing under it. The provision therefore has been retained (§ 805.103(c).)

41 Fed Reg. 10152 (Mar 9, 1976). In promulgating the 1979 amendments to these regulations, HUD again explained that

[t]he basic obstacle so far to the use of the Section 8 Program on Indian reservations has been the problem of obtaining private financing by an owner (whether it be a private owner or an IHA) for the construction or acquisition or rehabilitation of a project

44 Fed. Reg. 64204 (Nov 6, 1979) (Indian housing, final rule). These regulations simply assume that Indian housing will be situated in Indian areas

307

Thus, the Housing Act, its legislative history, and the accompanying Indian housing regulations all indicate that insofar as Congress intended to treat Indians specially under the Act, federal assistance would be directed to Indian areas. The Act is silent on the possibility of Indian-only off-reservation housing. If Congress has not authorized preferential treatment as part of the unique relationship between the federal government and the Indian Tribes, the Court has found that to interpret the law specially for Indians is "not shown to be necessary to the fulfillment of the policy of Congress to protect a less-favored people against their own improvidence or the over-reaching of others; nor is it conceivable that it is necessary, for the Indians are subjected only to the same rule of law as are others in this state. . . ." *United States* v. *Oklahoma Gas Co.*, 318 U.S. 206, 211 (1943). Indeed, if the special treatment of Indians cannot be grounded in their unique status as political entities—formerly sovereign nations which still retain a measure of inherent sovereignty over their people—and if no federal statute or practice exists that reflects this determination in regard to urban housing, to treat Indians other than as ordinary citizens would constitute impermissible discrimination. *See Fisher* v. *District Court*, 424 U.S. 382, 390 (1976); *Superintendent of Five Civilized Tribes* v. *Commissioner of Internal Revenue*, 295 U.S. 418, 421 (1935). *Cf. Morton* v. *Mancari*, 417 U.S. at 548 (exemptions in Title VII for tribal employment and preferential treatment by business on or near a reservation reveal "clear congressional sentiment that an Indian preference in the narrow context of tribal or reservation-related employment did not constitute racial discrimination of the type otherwise proscribed"). Here, in the absence of an express congressional indication specifically referring to Indian preferences in urban housing programs, "Indians are subject only to the same rule of law as are others." *F.P.C.* v. *Tuscarora Indian Nation*, 362 U.S. at 119; *Oklahoma Tax Comm'n* v. *United States*, 319 U.S. 598, 607 (1944); *United States* v. *Oklahoma Gas Co.*, 318 U.S. at 211.

Because the Housing Act, and administrative practice thereunder have not established off-reservation Indian housing preferences, Titles VI and VIII cannot be read to impliedly repeal such a preference. *Cf. Morton* v. *Mancari*, 417 U.S. at 550–551 (Equal Employment Opportunity Act of 1972 did not supersede specific statutory preference for Indians). The only remaining question is whether the extent of discretion over tenant selection authorized by Section 8 would enable a PHA or owner to condition tenant eligibility on membership in a recognized tribe. That is, has Congress sanctioned any preference concepts in the Section 8 regulations that could conceivably cover an Indian-exclusive tenant policy? Such a preference must either be consistent with Titles VI and VIII or be expressly accepted by Congress as superseding the general nondiscrimination requirements of those earlier statutes. *See Fullilove* v. *Klutznick*, 448 U.S. 448, 492 n.77 (1980) (later, specific preference provision supersedes earlier general non-discrimination statute).

*D. Section 8 and HUD Regulations for Tenant Selection in Section 8 Housing Permit No Specific Preferences That Could be Read to Include an Indian Preference.*

(1) As noted above in Section II.A, Section 8 itself places the duty of tenant selection on the housing owner and creates an express statutory preference only

for families which occupy substandard housing or are involuntarily displaced. The regulations describing the policies and procedures applicable to Section 8 Moderate Rehabilitation Programs under the Housing Act are set forth at 24 C.F.R. § 882, with special procedures for moderate rehabilitation in subparts D and E (1981).[13] On the one hand, the regulations explicitly single out certain groups for attention. For example, in submitting an application for a moderate rehabilitation program, the PHA must certify that it will take "affirmative action to provide opportunities to participate in the Program to those elderly persons expected to reside in the locality and those Familys [sic] expected to reside in the community as a result of current or planned employment. . . ." 24 C.F.R. § 882.503(b)(1)(ii). The PHA must further certify "that the PHA will provide a preference for . . . Families displaced as a result of Moderate Rehabilitation. . . ." 24 C.F.R. § 882.503(a)(2)(ii)(C). On the other hand, they provide no indication that the Secretary of HUD could make funds available to an Urban Housing program open only to Indians who are enrolled tribal members. Indeed, a PHA applying for federal funds under Section 8 must include an equal opportunity housing plan in its submission. 24 C.F.R. § 882.503(b).

While the somewhat circular nature of the regulations makes it difficult to determine what an equal opportunity plan entails,[14] there is no reason to believe that the language does not mean what it says: no discrimination. The only preferential treatment expressly permitted by the regulations defining the equal opportunity plan is that "the PHA may establish a preference for applicants currently residing in that neighborhood who are being directly displaced by HUD programs." 24 C.F.R. § 882.517(b). This preference both reflects the Section 8 statutory language and does not conflict with Title VI and VIII or the Fifth Amendment.

Significantly, the permissibility of any preferences is circumscribed by the requirement that the equal opportunity plan must include "signed certification of the applicant's intention to comply with Title VI of the Civil Rights Act of 1964; Title VIII of the Civil Rights Act of 1968; [and] Executive Order 11246. . . ." 24 C.F.R. § 882.503(b)(1)(ii).[15] In contrast to other legislation and regulations that expressly authorize agencies to take affirmative action which favors members of certain disadvantaged racial or ethnic groups to the exclusion of other persons, nothing in the regulations for Section 8 sanctions a racially or ethnically exclusive tenant policy. *Cf. Fullilove* v. *Klutznick,* 448 U.S. 448 (upholding Public

---

[13] The special procedures for moderate rehabilitation programs were promulgated in 1979. *See* 44 Fed. Reg. 26670 (May 4, 1979)

[14] The plan must describe the PHA's policies for "[s]electing from among eligible applicant Families those to be referred to Owners     including any provisions establishing preferences for selection." 24 C F.R § 882.503(b)(1)(C)  The only indication of what those preferences might encompass appears in 24 C.F.R § 882 517(b). But § 882.517(b) refers back to § 882 503 in stating that "[t]he PHA must select Families for participation in accordance with the provisions of the Program and in accordance with the PHA's application, including any PHA requirements or preferences as approved by HUD. (*See* 24 C F.R § 882 503(b)(1)(i)(C))."

[15] HUD has also issued specific regulations effectuating the provisions of Title VI   24 C F R. § 1.1 (1981) Analogous to the Section 8 regulations, the Title VI regulations permit recipients of federal financial assistance operating low-rent housing under the Housing Act of 1937 to assign applicants to dwelling units based on preferences or priorities established by the recipient's regulations and approved by HUD  But these preferences may not be "inconsistent with the objectives of Title VI of the Civil Rights Act of 1964 and this Part I " 24 C F R. § 1.4  The HUD regulations effectuating Title VI were issued in 1973  *See* Fed  Reg  17949 (July 5, 1973).

Works Employment Act of 1977, 42 U.S.C. §§ 6701–6710 which establishes in § 103(f)(2) a minority business enterprise set-aside). Pub. L. No. 95–28, 91 Stat. 116, 117 (1977). In light of the express protections for the elderly, the handicapped, or displaced families, the absence of explicit preferences for racial or ethnic groups, and the nondiscrimination obligations imposed on HUD by Titles VI and VIII, HUD would appear to have no discretion to direct Section 8 funds to programs exclusively designed for a special racial or ethnic group, including urban Indians.

*E. No Sufficiently Explicit Tenant Preference Provision Exists to Constitute an Exception to Title VI Requirement.*

Having determined that neither Section 8 of the Housing Act nor the Section 8 regulations expressly sanction any preference that conceivably could cover urban Indians, two rules of statutory construction are relevant. First, in the absence of any legislative indication or administrative practice, there is no basis for interpreting the word "preference" in the regulations, 24 C.F.R. § 882.503(b), to include an urban "Indian only" policy. *Cf. Morton v. Mancari*, 417 U.S. 535. As we concluded in II. C. (1) and (2) above, with respect to urban housing, Indians stand on no different footing than do other minorities in our pluralistic society. Congress has expressed no intent to treat urban Indians preferentially, and, in light of the congressional silence, such a determination "cannot rest on dubious inferences." *Oklahoma Tax Comm'n v. United States*, 319 U.S. at 607.

Second, Congress enacted Section 8 against the backdrop of the non-discrimination statutes. HUD regulations specifically incorporated Title VI requirements. *See* n.15 *infra*. Congress cannot have been unaware of these laws and therefore its silence concerning urban Indian housing preferences cannot be interpreted as an implied repeal of the earlier nondiscrimination provisions. *See Watt v. Alaska*, 451 U.S. at 267–273; *Morton v. Mancari*, 417 U.S. at 549–550. The presumption against implied repeals requires that the legislature's intention to repeal must be "clear and manifest." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939). Nothing in the legislative history of Section 8 indicates affirmatively a congressional intent to exempt urban Indians from the existing prohibitions on discrimination. The absence of a statutory preference for Indian-only urban housing and the lack of administrative precedent for providing Section 8 funds to Indian-only urban programs clearly do not constitute such a manifest intent to exempt Indians from the otherwise applicable requirements of Title VI and VIII. We conclude that HUD has no discretion to direct Section 8 funds to programs exclusively designed for urban Indians.

In reaching this conclusion, we would add that the present situation differs from that in *Morton v. Ruiz*, 415 U.S. 199 (1974), which involved a conflict between a congressional intent to benefit Indians *near* the reservation and an agency's conviction that it was not authorized to provide benefits to off-reservation Indians. In *Ruiz*, the Bureau of Indian Affairs (BIA) asserted that under its regulations it had no discretion to provide general assistance to off-reservation

310

Indians. 415 U.S. at 204. But the Court noted that the BIA had represented to Congress that Indians "on or near" reservations were eligible for benefits, and Congress accordingly had appropriated funds to cover welfare services for Indians residing at least "on or near" reservations. 415 U.S. at 229–30. The Court, therefore, found the agency's position that it could not provide off-reservation benefits inconsistent with the congressional intent to benefit Indians "on or near" a reservation.

Here, however, Congress has evinced an intent to provide "Indian only" housing solely on reservations or similarly owned Indian areas. *See Indian and Alaskan Native Housing Programs, Hearings Before the Subcommittee on Housing and Community Developments of the Comm. on Banking, Finance and Urban Affairs, House of Representatives*, 96th Cong., 2d Sess. (1980) (no indication throughout hearings that "Indian only" programs are intended for off-reservation Indians). Moreover, the one time that Congress explicitly targeted funds for Indian housing, it expressly prohibited the use of such funds for Section 8 housing. *See* 42 U.S.C. § 1437c(c) (1976);[16] H.R. Rep. No. 1114, 93d Cong., 2d Sess. 25 (1974). Notwithstanding the general rule of statutory construction that legislation involving Indians is to be construed in their favor, we find no evidence whatsoever that Congress intended to provide Section 8 rental assistance specially for Indians in an off-reservation context. Therefore, the policy of construing any ambiguities to the benefit of Indians does not even come into play. *See Cramer* v. *United States*, 261 U.S. 219, 229 (1923) (government protects rights of Indians if such rights are recognized in statute or flow from settled governmental policy).

## III. Conclusion

Section 8 provides no authority for HUD to make federal funds available to an urban Moderate Rehabilitation Program whose occupancy is limited to Indian tribal members. Nor do the Indian housing regulations envisage "Indian only" housing programs in urban areas with respect to which Indian tribes have no unique, semi-sovereign relationship. In the absence of any federal legislation or regulations recognizing Congress' special relationship to the Indians with respect to urban housing or authorizing HUD to assist specially urban Indian housing, we conclude that Congress intended to treat Indians in the same manner as all other citizens for purposes of Section 8 Moderate Rehabilitation Housing in urban

---

[16] In pertinent part, § 1437c(c) stated:

> In addition, the Secretary shall enter into contracts for annual contributions, out of the aggregate amount of contracts for annual contributions authorized under this section to be entered into on or after July 1, 1974, aggregating at least $15,000,000 per annum, which amount shall be increased by not less than $15,000,000 per annum, on July 1, 1975, and by not less than $17,000,000 per annum on October 1, 1976, to assist in financing the development acquisition cost of low-income housing for families who are members of any Indian tribe, band, pueblo, group, or community of Indians or Alaska Natives which is recognized by the Federal Government as eligible for service from the Bureau of Indian Affairs, or who are wards of any State government, except that none of the funds made available under this sentence shall be available for use under section 1437f of this title.

Later amendments did not specifically target funds to Indians

areas. *See F.P.C.* v. *Tuscarora Indian Nation,* 362 U.S. at 118. HUD, therefore, has no discretion to provide tenant rental assistance to a Section 8 program with an exclusive occupancy policy.

We would add that nothing in this opinion is intended to suggest that a housing project intended to serve the particular needs identified by St. Paul authorities in this case could not be approximated by developing tenant occupancy policies based on the various types of preferences which are authorized under the Housing Act and Section 8. We conclude only that HUD is presently without statutory authority to grant Section 8 funds to an urban rehabilitation program restricted in its occupancy exclusively to Indians.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*