## UNITED STATES *v.* OKLAHOMA GAS & ELECTRIC CO.

No. 171. Argued December 9, 1942.—Decided February 15, 1943.

---

*Mr. Valentine Brookes* argued the cause, and *Solicitor General Fahy, Assistant Attorney General Littell,* and *Mr. Vernon L. Wilkinson* were on the brief, for the United States.

*Mr. Streeter B. Flynn,* with whom *Mr. R. M. Rainey* was on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The United States sued the Oklahoma Gas and Electric Company in the United States District Court asking a declaratory judgment that the Company illegally occupies with its pole line certain Indian land, and a mandatory injunction to terminate such occupation. The case turns on whether permission to the State of Oklahoma to establish a highway over allotted Indian land given under § 4 of the Act of March 3, 1901,[1] includes the right to permit maintenance of rural electric service lines within the highway bounds.

The United States at all relevant times held title to half of a quarter section of land in Oklahoma in trust for She-pah-tho-quah, a Mexican Kickapoo Indian allottee thereof; and since her death, for her heirs. The State of Oklahoma applied to the Secretary of the Interior "to grant permission in accordance with § 4 of the Act of March 3, 1901 (31 Stat. L. 1058, 1084), to open and establish a public highway" across the land in question. The highway width was 80 feet, and it extended 2,577 feet on these lands, occupying 4.55 acres thereof. The State paid therefor $1,275 as compensation to the heirs of She-pah-tho-quah, and on January 20, 1928, the map of definite location was on behalf of the Secretary endorsed "Approved subject to the provisions of the Act of March 3, 1901 (31 Stat. L. 1058, 1084), Department regulations

---

[1] 31 Stat. 1058, 1084, 25 U. S. C. § 311.

thereunder; and subject also to any prior valid existing right or adverse claim."

Section 4 of the Act of March 3, 1901, under which the application was specifically made and granted, provides:

"That the Secretary of the Interior is hereby authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indians under any laws or treaties but which have not yet been conveyed to the allottees with full power of alienation."

Apparently the Secretary has never issued a regulation applicable to this case. Cf. 25 Code of Federal Regulations § 261.1 et seq.

The highway was opened, and in 1936 the Oklahoma State Highway Commission, with statutory authority to act in the matter,[2] granted respondent the license under which it occupies a portion of the highway with its rural electric service line. The license is in terms revocable at will, provides for location of the poles 38 feet from the center of the highway, and requires all lines to be kept in good repair. The licensee assumes all liability for damage, and the license recites that it is "granted subject to any and all claims made by adjacent property owners as compensation for additional burden on such adjacent and abutting property."

The Secretary considered this use of the property not warranted by his permission to the State to establish a highway under § 4 of the Act of March 3, 1901. He demanded that the Company apply to him under the Acts

---

[2] 69 Oklahoma Stat. (1941) § 57.

of February 15, 1901 and March 4, 1911 [3] for permission to maintain its lines and, when the Company refused, instituted this action. The District Court dismissed the complaint, and the Circuit Court of Appeals for the Tenth Circuit affirmed. 37 F. Supp. 347, 127 F. 2d 349. The question appeared important to the administration of Indian affairs, and we granted certiorari.

It is not denied that under the laws of Oklahoma the use made of the highway by respondent, the State's licensee, is a lawful and proper highway use, imposing no additional burden for which a grantor of the highway easement would be entitled to compensation. But the Government denies that the Act of March 3, 1901, providing "for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated," submits the scope of the highway use to state law. Its interpretation gives the Act a very limited meaning and substantially confines state law to governing procedures for "opening and establishment" of the highway. It offers as examples of what is permitted to state determination, whether a state or county agency builds the road, whether funds shall be raised by bond issue or otherwise, and the terms and specifications of the construction contract. The issue is between this narrow view of the State's authority and the broader one which recognizes its laws as determining the various uses which go to make up the "public highway," opening and establishment of which are authorized.

We see no reason to believe that Congress intended to grant to local authorities a power so limited in a matter so commonly subject to complete local control.

It is well settled that a conveyance by the United States of land which it owns beneficially or, as in this case, for

---

[3] 31 Stat. 790, 43 U. S. C. § 959; 36 Stat. 1235, 1253, 43 U. S. C. § 961. These are set out and discussed *infra*, pp. 213 *et seq.*

the purpose of exercising its guardianship over Indians, is to be construed, in the absence of any contrary indication of intention, according to the law of the State where the land lies.[4]  Presumably Congress intended that this case be decided by reference to some law, but the Government has cited and we know of no federal statutory or common-law rule for determining whether the running of the electric service lines here involved was a highway use. These considerations, as well as the explicit reference in the Act to state law in the matter of "establishment" as well as of "opening" the highway, indicate that the question in this case is to be answered by reference to that law, in the absence of any governing administrative ruling, statute, or dominating consideration of Congressional policy to the contrary.  We find none of these.

Apparently the Secretary has never sought to solve the problem of this case by an administrative ruling, and whether he might do so is a question which the parties have neither raised nor discussed, and upon which we intimate no opinion.

In construing this statute as to the incidents of a highway grant we must bear in mind that the Act contemplated a conveyance to a public body, not to a private interest.  There was not the reason to withhold continuing control over the uses of the strip that might be withheld wisely in a grant of indefinite duration to a private grantee.  It is said that the use here permitted by the State is private and commercial, and so it is.  But a license to use the highway by a carrier of passengers for hire, or by a motor freight line, would also be a private

---

[4] *Grand Rapids & Indiana R. Co.* v. *Butler,* 159 U. S. 87; *Whitaker* v. *McBride,* 197 U. S. 510; *Oklahoma* v. *Texas,* 258 U. S. 574, 595–596; see *Brewer Oil Co.* v. *United States,* 260 U. S. 77, 88–89; *United States* v. *Oregon,* 295 U. S. 1, 28; cf. *Board of Commissioners* v. *United States,* 308 U. S. 343.

and commercial use in the same sense. And it has long been both customary and lawful to stimulate private self-interest and utilize the profit motive to get needful services performed for the public. The State appears to be doing no more than that.

This is not such a transmission line as might endanger highway travel or abutting owners with no compensating advantage. It is a rural service line, and to bring electric energy in to the countryside is quite as essential to modern life as many other uses of the highway. The State has granted nothing not revocable at will, has alienated nothing obtained under the Act, has permitted no use that would obstruct or interfere with the use for which the highway was established, and has not purported to confer any right not subsidiary to its own or which would survive abandonment of the highway.

The interpretation suggested by the Government is not shown to be necessary to the fulfillment of the policy of Congress to protect a less-favored people against their own improvidence or the overreaching of others; nor is it conceivable that it is necessary, for the Indians are subjected only to the same rule of law as are others in the State, and then only by permission of the Secretary, subject to compliance with "such requirements as he may deem necessary."

Oklahoma is spotted with restricted lands held in trust for Indian allottees. Complications and confusion would follow from applying to highways crossing or abutting such lands rules differing from those which obtain as to lands of non-Indians. We believe that if Congress had intended this it would have made its meaning clear.

The Government relies, however, on the Acts of February 15, 1901, and of March 4, 1911, which it says require the Secretary's consent to cross Indian land with electric lines, regardless of the prior grant of permission for the

highway. We believe that they are inapplicable to the land in suit, and therefore need not determine what would be their effect if they did apply.

The Act of February 15, 1901, "An Act Relating to rights of way through certain parks, reservations, and other public lands," [5] authorizes the Secretary of the Interior "to permit the use of rights of way through the public lands, forest and other reservations of the United States, and the Yosemite, Sequoia, and General Grant national parks, California, for electrical plants, poles, and lines for the generation and distribution of electrical power, and for telephone and telegraph purposes . . . to the extent of . . . not to exceed fifty feet on each side of the center line of such . . . electrical, telegraph, and telephone lines and poles . . .: *Provided,* That such permits shall be allowed within or through any of said parks or any forest, military, Indian, or other reservation only upon the approval of the chief officer of the Department under whose supervision such park or reservation falls and upon a finding by him that the same is not incompatible with the public interest: *Provided further,* That all permits given hereunder for telegraph and telephone purposes shall be subject to the provision of title sixty-five of the Revised Statutes of the United States, and amendments thereto, regulating rights of way for telegraph companies over the public domain: *And provided further,* That any permission given by the Secretary of the Interior under the provisions of this Act may be revoked by him or his successor in his discretion, and shall not be held to confer any right, or easement, or interest in, to, or over any public land, reservation, or park." [6]

---

[5] H. R. Rep. No. 1850, 56th Cong., 1st Sess., indicates that the title of the Act, referring to public lands, was advisedly chosen.

[6] 31 Stat. 790, 43 U. S. C. § 959.

For all present purposes the Act of March 4, 1911 is the same as the above Act.[7]

Neither statute makes any reference whatever to lands allotted to Indians in which the United States holds title in trust only to prevent improvident alienation. Their general tenor and particularly the second proviso of the Act of February 15, 1901, repel any inference that they

---

[7] 36 Stat. 1235, 1253, 43 U. S. C. § 961, providing:

"That the head of the department having jurisdiction over the lands be, and he hereby is, authorized and empowered, under general regulations to be fixed by him, to grant an easement for rights of way, for a period not exceeding fifty years from the date of the issuance of such grant, over, across, and upon the public lands, national forests, and reservations of the United States for electrical poles and lines for the transmission and distribution of electrical power, and for poles and lines for telephone and telegraph purposes, to the extent of twenty feet on each side of the center line of such electrical, telephone and telegraph lines and poles, to any citizen, association, or corporation of the United States, where it is intended by such to exercise the right of way herein granted for any one or more of the purposes herein named: *Provided,* That such right of way shall be allowed within or through any national park, national forest, military, Indian, or any other reservation only upon the approval of the chief officer of the department under whose supervision or control such reservation falls, and upon a finding by him that the same is not incompatible with the public interest: *Provided,* That all or any part of such right of way may be forfeited and annulled by declaration of the head of the department having jurisdiction over the lands for nonuse for a period of two years or for abandonment."

See 40 L. D. 30, 31: "It will be observed that this act, which authorizes the granting of easements for electrical power transmission, and telephone and telegraph lines for stated periods not to exceed 50 years, follows, as closely as is possible in the accomplishment of its purposes, the language of the act of February 15, 1901 (31 Stat., 790), which authorizes mere revocable permits or licenses for such lines, and for other purposes. This act, therefore, merely authorizes additional or larger grants and does not modify or repeal the act of 1901, and should be construed and applied in harmony with it." See also, 46 Cong. Rec. 4014–4015.

were intended to govern the grant of rights of way over such lands. The effect of this proviso was to make any telephone or telegraph company which availed itself of the Act subject, as to Government business, to the rates set by the Postmaster General, and to make "all the . . . lines, property, and effects" of such a company subject to purchase by the Government at a value to be ascertained by an appraisal of five persons, two selected by the Postmaster General, two by the company, and one by the four so chosen.[8] It is rather difficult to believe that Congress ever intended to exact such conditions as part of the price of running a line across land in which the Government is interested only to the extent of holding title for the protection of an individual Indian allottee. It is particularly difficult in the context of the Acts, for if such were the intent it was defeated by giving an option to obtain the same rights by condemnation under state law and free of such restrictions. § 3 of the Act of March 3, 1901.[9]

The Government seeks to repel the force of these implications by asserting that the word "reservation" as employed in these Acts includes such land.

Section 4 of the Act of March 3, 1901 authorizes permission to run a highway "through any Indian reservation or through any lands which have been allotted in severalty to any individual Indians under any laws or treaties but which have not been conveyed to the allottees with full power of alienation." The Act in § 3 also refers to "lands allotted in severalty," after already employing the word "reservation." If it included allotted lands without these words, Congress was employing language to no discernible purpose. We think Congress employed this language in the Act of March 3, 1901, to a purpose and with a clear distinction between reservations and allotted lands. Sec-

---

[8] Comp. Stat. (1901) §§ 5266, 5267.
[9] 31 Stat. 1083–1084, 25 U. S. C. § 357.

tion 3 made allotted lands, but not reservations, subject to condemnation for any public purpose; § 4 made both reservations and allotted lands subject to highway permits by the Secretary. We think that the almost contemporaneous Act of February 15, 1901, in authorizing permits for electric companies through reservations, but not allotted lands, meant just what it said.

We have no purpose to decide anything more than the case before us. We do not say that "reservation" may never include allotted lands; all we hold is that if there is a distinction in fact, that distinction is carried into the Act. So we turn to the question whether these particular allotted lands were in fact within or without a "reservation."

She-pah-tho-quah, the allottee, was of the Kickapoo Tribe. In earlier times the Kickapoo Tribe occupied a treaty reservation in Kansas.[10] They became torn by internal dissensions. One faction remained on the old reservation in Kansas and received allotments there.[11] Others migrated, chiefly in 1852 and 1863, to Mexico and located on a reservation set apart for them by that Government. The Oklahoma Kickapoos comprise those who left Mexico, mostly in 1873, and returned to the United States. Ten years later a reservation was established for them by Executive Order in what was then Indian Territory, now Oklahoma. *United States* v. *Reily,* 290 U. S. 33, 35–36.

In 1891, however, these restless people negotiated a sale of their reservation to the Government "except the Commissioners insist on the Indians taking lands in allotment, while the Indians insist on taking an equal amount of land as a diminished reservation, the title to be held in common."[12] This disagreement was submitted to the Secre-

---

[10] Treaties of October 24, 1832, 7 Stat. 391; May 18, 1854, 10 Stat. 1078.

[11] Treaty of June 28, 1862, 13 Stat. 623.

[12] 27 Stat. 560.

tary of the Interior and he decided that the "Indians take their lands in allotment and not to be held in common."[13] The Kickapoo Tribe thereupon, on September 9, 1891 did "cede, convey, transfer, and relinquish, forever, and absolutely, without any reservation whatever, all their claim, title, and interest" to the reservation lands.[14]   In consideration each of the Kickapoos, estimated at about 300 in number, was allotted 80 acres of such land with a per capita cash payment.[15]   The transaction was ratified, and carried out on the part of the United States and the land acquired by the United States was opened to settlement.[16]   Thus, the Kickapoo reservation was obliterated, the tribal lands were no more, and only individual allotments survived. We think it clear that the term "reservation" as used in the statutes in question had no application to such lands.

It is true that the opinion in *United States* v. *Reily, supra,* at 35, used the term "Kickapoo Reservation" to describe a region of Oklahoma as of a time subsequent to the dissolution.  It is clear from the context of the opinion, however, that this term was used in a geographical and not a legal sense, much as one still speaks of the Northwest Territory.  Congress has frequently referred to the "Kickapoo Reservation" in Kansas.[17]  And it has often, usually in the same statute, referred to the Kickapoo Indians of Oklahoma; but never since the dissolution has it referred to a Kickapoo Reservation as existing in

---

[13] 27 Stat. 561.

[14] 27 Stat. 557.

[15] 27 Stat. 558–559.

[16] 27 Stat. 562–563, 29 Stat. 868.

[17] 28 Stat. 909; 30 Stat. 590, 909, 943; 33 Stat. 213, 1074, 1254; 35 Stat. 80, 791; 36 Stat. 275, 1064; 37 Stat. 524; 38 Stat. 87, 590; 39 Stat. 133, 977; 40 Stat. 571; 41 Stat. 13, 66, 419, 523; 42 Stat. 57.

Oklahoma.[18] If descriptive nomenclature has any weight in this case, we think that the usage of Congress preponderates.

The dissolution of the reservation distinguishes the situation before us from that before the court relating to allotted lands within the Tulalip Reservation, *United States* v. *Celestine*, 215 U. S. 278; allotted lands within the Yakima Reservation, *United States* v. *Sutton*, 215 U. S. 291; those within the Colville Reservation, *United States* v. *Pelican*, 232 U. S. 442; and the many situations in which the departmental rulings have held that the phrase "Indian, or other reservation" includes individual allotments.[19]

On the argument inquiry was made of counsel whether a consistent departmental practice existed in reference to grants of permission to electric companies to maintain lines along established highways. Both have called attention to a few instances of applications and grants, or of assurances none were necessary, said to favor their respective positions.[20] We find no consistent departmental

---

[18] 30 Stat. 77, 937; 33 Stat. 203, 1057; 34 Stat. 363, 1043; 35 Stat. 88, 802; 36 Stat. 280, 1069; 37 Stat. 529; 38 Stat. 93, 596; 39 Stat. 145, 982; 40 Stat. 578; 41 Stat. 20, 425, 1039, 1240; 42 Stat. 573, 1195; 43 Stat. 409, 708, 1160.

[19] 27 L. D. 421; 35 L. D. 550; 40 L. D. 30; 42 L. D. 419; 45 L. D. 563; 49 L. D. 396; 51 L. D. 41.

[20] The Government calls attention to permits given as to allotments within the Yakima and Colville reservations, which are inapplicable under our view of the case. Also to one permit to this respondent for a transmission line across a Kickapoo allotment within the boundaries of a previously authorized highway and one to it not within a highway. Respondent sets up correspondence in 1922, 1927, 1929 and 1930 claimed to indicate a contrary practice. None of this material is part of the record; and it is incomplete, and in no sense satisfactory establishment of a basis for any conclusion.

practice which can be said to amount to an administrative construction of the Acts in question.

The judgment below is

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS dissent.