[No. S008470. Dec. 17, 1990.]

JERRY BOISCLAIR et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
IMPERIAL GRANITE COMPANY, Real Party in Interest.

■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Shirlyn P. Daddario, Terry Singleton, Alexander & Karshmer, Barbara E. Karshmer, George Forman and Margaret B. Crow for Petitioners.

No appearance for Respondent.

Charles C. Renshaw for Real Party in Interest.

**OPINION**

MOSK, J.— ■ ■■ ■■ ■ This is a petition for writ of mandate or prohibition after denial of motions to quash service of summons and to dismiss for lack of subject matter jurisdiction[1] in an action to determine easement rights or public rights to use a road.

Real party in interest Imperial Granite Company (hereafter Imperial), a corporation that mines and transports granite, contends that a dirt road running through Indian trust land is either a public road or a road over which it has easement rights. Petitioners (hereafter the Indian defendants), all members of the Pala Indian Tribe, contend that the road is part of Indian trust land and that they are free to deny access to Imperial. The case presents two questions. First, when one side claims that real property disputed in litigation is Indian trust property and the other side denies that

---

[1] We note that although a motion to quash is normally directed at defects in personal, as opposed to subject matter, jurisdiction (see 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 161, pp. 546-548), we have recognized the hybrid motion to quash/dismiss as a proper means of challenging the court's authority without making a general appearance. (*Goodwine* v. *Superior Court* (1965) 63 Cal.2d 481, 484-485 [47 Cal.Rptr. 201, 407 P.2d 1]; see also *Kumar* v. *Superior Court* (1982) 32 Cal.3d 689, 691 [186 Cal.Rptr. 772, 652 P.2d 1003] [propriety of motion assumed].) This is consistent with the general rule that subject matter jurisdiction can be challenged at any time during the course of an action. (*Barnick* v. *Longs Drug Stores* (1988) 203 Cal.App.3d 377, 379 [250 Cal.Rptr. 10].)

claim, may a state court assume jurisdiction over the dispute despite a federal statute barring state adjudication of the "ownership or right of possession" of Indian property? Second, do the Indian defendants, each of them tribal officers, enjoy sovereign immunity from liability? We conclude that both questions should be answered in the negative.

FACTS

Most of the facts are undisputed. The Indian defendants are tribal officers and enrolled members of the Pala Band of Mission Indians, a recognized Indian tribe organized under the Indian Reorganization Act (25 U.S.C. § 476). Two of the parcels of land in question, denominated parcels 2 and 4, are held in trust by the United States for the Pala Band. Parcel 2 was granted in fee to the Pala Band in 1973, but is subject to a 25-year trusteeship period by the United States.

Imperial leases parcel 1, on which it operates a granite mine. The company uses a dirt road that runs from the mine to McGee Road, a public road, to transport the quarried granite. It is the ownership and use of this dirt road that is the subject of the present dispute. The road traverses parcels 1 through 4, each parcel being consecutively contiguous, before connecting with McGee Road.

Parcel 3 is non-Indian land outside the borders of an Indian reservation, and is known as the Agua Tibia Ranch. The ranch is owned by the Bradfords, non-Indians who are codefendants in this case but have not joined in the writ proceeding that is presently under review.

It appears from the record that parcels 1, 2 and 4 were purchased for the Pala Indians by the United States government around the turn of the century. Robert McGee, a member of the Pala Band, entered into a contract to purchase parcel 1 from the United States in 1924, and received fee title in 1942. In 1933, the United States built the road in question, crossing all four parcels to reach McGee Road. Some time around 1955, the mining activity on parcel 1 was initiated. In 1981, Imperial entered into a lease with the McGee family to operate the mine on that parcel.

The present dispute began when the Bradfords welded shut a gate that extends across the road on the Agua Tibia Ranch, thereby denying Imperial its sole means of egress to McGee Road. Imperial brought suit in superior court against the Bradfords and the Indian defendants, claiming defendants were committing trespass and/or nuisance by interfering with their use of the road. Imperial alleged in its first amended complaint that either the road in question was public and open to all, or that parcel 1 had an implied or

reserved easement over parcels 2, 3, and 4 that gave it the right to use the road.

It is not clear from the face of the complaint why the Indians were joined as defendants, although the first amended complaint alleges they "conspired" with the Bradfords to shut the gate, and perhaps that they may have been involved in other unspecified obstructive activity.

Imperial sought declaratory relief, asking the court to affirm its easement right or public right to use the road. It also sought injunctive relief, both to have the gate on the ranch parcel removed, and to prospectively enjoin the Indian and non-Indian defendants from interfering with its use of the road at any point. In addition, Imperial sought compensatory damages against all defendants for the harm resulting from the obstruction, as well as punitive damages.

The Indian defendants, in a special appearance in superior court, moved to dismiss the complaint against them, asserting that the court lacked subject matter jurisdiction and that they possessed sovereign immunity from such suits. The court denied the motion, and these defendants sought a writ of mandate from the Court of Appeal to compel dismissal. The Court of Appeal denied the petition. We granted review to consider the important jurisdictional question this case poses concerning the power of state courts to settle disputes over Indian land.[2]

## I. The Jurisdictional Issue

At the center of the jurisdictional issue, and indeed of this case, is the proper construction of 28 United States Code section 1360.[3] Section 1360(a) gives certain states, including California, jurisdiction over civil disputes that involve Indians and arise in Indian country. Section 1360(b), however, limits the scope of such state power and jurisdiction: it specifies that section 1360(a) does not authorize the "alienation, encumbrance or taxation of any real or personal property . . . belonging to any Indian, or any Indian tribes, bands, or community," nor does it authorize the "regulation of the use" of Indian property "in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto." Finally, and most importantly for the present case, section 1360(b) provides that the general grant of civil jurisdiction does not *"confer jurisdiction upon the State*

---

[2] The Indian defendants also complain of Imperial's failure to join the United States in this suit as an indispensable party. This issue was not raised below, and hence will not be considered here. (Cal. Rules of Court, rule 29(b)(1).)

[3] For brevity's sake, this section will be referred to as section 1360.

*to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of [Indian] property or any interest therein.*" (Italics added.)[4]

### A. Federal Preemption, Indian Sovereignty, and State Authority Over Indian Affairs

Section 1360 must be understood in the historical context of the relationship between the federal government, state government, and Indian tribes. A review of this history makes clear the federal government's predominance over Indian affairs in general and over Indian land policy in particular.

■ " 'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this nation's history.' " (*McClanahan* v. *Arizona State Tax Comm'n* (1973) 411 U.S. 164, 168 [36 L.Ed.2d 129, 133, 93 S.Ct. 1257].) This policy has two independent but interrelated bases: federal preemption and the internal sovereign rights of Indian tribes. (*White Mountain Apache Tribe* v. *Bracker* (1980) 448 U.S. 136, 142 [65 L.Ed.2d 665, 671-672, 100 S.Ct. 2578].) Early decisions stress Indian sovereignty as the basis for the exclusion of states from Indian affairs. (See *Worcester* v. *Georgia* (1832) 31 U.S. (6 Pet.) 515, 556-557 [8 L.Ed. 483, 499-500].) This view has persisted, though in modified form, to the present day. Although Indian tribes do not possess the full sovereignty of independent nations, decisional law has "continued to stress that Indian tribes are unique aggregations possessing ' "attributes of sovereignty over both their members and their

---

[4] Section 1360 reads in its entirety:

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

| "State of | Indian country affected |
|---|---|
| ". . . . . . . . . . . | . . . . . . . |
| "California | All Indian country within the State |
| ". . . . . . . . . . | . . . . . . . |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize the regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or any other regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section."

territory." ' " (*New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324, 332 [76 L.Ed.2d 611, 619, 103 S.Ct. 2378].)

In more recent times, courts have come to favor federal preemption over inherent sovereignty as the primary justification for the preclusion of state authority over Indian affairs. (See *McClanahan* v. *Arizona State Tax Comm'n, supra*, 411 U.S. 164, 172.) The basis for this assertion of exclusive federal authority over Indian affairs is rooted in three provisions of the United States Constitution: the Indian commerce clause (art. I, § 8, cl. 3), which gives Congress the exclusive power to control Indian commerce; the treaty clause (art. II, § 2, cl. 2); and the supremacy clause (art. VI, cl. 2), which, together with extensive congressional legislation on Indian affairs, has broadly preempted state law. (Cohen, Handbook of Federal Indian Law (1982 ed.) pp. 207-208, 270-271 (hereafter Cohen).)

The predominance of the federal government in Indian affairs is nowhere more pronounced than in the field of Indian property law. Most Indian lands are owned by the United States and held in trust for the benefit of Indians. (Cohen, *supra*, at p. 209.) In addition to the formal trust relationship, there is extensive federal legislation protecting Indian property and property claims. Chief among these are statutes that forbid the alienation of Indian tribal property without approval by the federal government. (25 U.S.C. §§ 177, 464.) Lands allotted by the government to individual Indians under the General Allotment Act of 1887 (25 U.S.C. § 348) are also subject to an indefinite federal trust period, and alienation of these lands is subject to prior federal approval as well. The subjection of Indian property to restrictions on alienation and federal trusteeship preempts certain state-law defenses to title actions, such as adverse possession, laches and estoppel by sale. (Cohen, *supra*, at p. 520.) Federal law also requires that in property disputes in which one party is non-Indian and the other Indian, the burden of proof is on the non-Indian litigant once the Indian party has shown presumption of title by virtue of previous ownership and possession. (25 U.S.C. § 194; see *Wilson* v. *Omaha Indian Tribe* (1979) 442 U.S. 653 [61 L.Ed.2d 153, 99 S.Ct. 2529] [construing 25 U.S.C. § 194 broadly in favor of the Indians].)

The basis for this exclusive federal-Indian relationship regarding Indian land derives, again, both from notions of inherent sovereignty and federal preemption. Indian sovereignty is reflected in the unique nature of Indian title, which bestows a right not of ownership but of occupancy "good against all but the sovereign" United States government and is recognized as the basis for exclusive federal jurisdiction over Indian property. (*Oneida Indian Nation* v. *County of Oneida* (1974) 414 U.S. 661, 667 [39 L.Ed.2d 73, 79, 94 S.Ct. 772].) From the concept of Indian title emerges "the

rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent . . . ." (*Id.* at p. 670 [39 L.Ed.2d at p. 80].)

Federal preemption arises from extensive federal Indian land legislation, such as the restrictions on alienation cited above. The protection of Indian trust land through federal legislation has been one of the principal means by which the federal government has sought to secure the economic well being and tribal autonomy of native Americans. (Cohen, *supra*, at pp. 196-200, 509.) "If tribal lands were not subject to restraints on alienation and tax immunities, market forces and state tax assessors would eventually erode Indian ownership of the reservation." (*Id.* at p. 509.)

■ The federal government's relationship to Indians and their land is not only exclusive but fiduciary. Courts have held the United States, as trustee of Indian property, to the obligation of acting in the Indians' best interest. (See, e.g., *Seminole Nation* v. *U.S.* (1942) 316 U.S. 286, 296-297 [86 L.Ed. 1480, 1490-1491, 62 S.Ct. 1049]; *United States* v. *Kagama* (1886) 118 U.S. 375, 383-384 [30 L.Ed. 228, 231, 6 S.Ct. 1109]; see also Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians* (1975) 27 Stan.L.Rev. 1213.) The basis for this fiduciary relationship between the United States and the Indians was early articulated in *United States* v. *Kagama, supra,* 118 U.S. at page 384 [30 L.Ed. at page 231]: "From [the Indians'] very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power."

Federal Indian land policy has itself oscillated between the promotion of Indian tribal autonomy and the desire to assimilate Indians as ordinary citizens into American society. A policy of allotting Indian tribal land to individual Indians in the late-19th and early-20th centuries was curtailed when the policy resulted in widespread alienation of Indian holdings and resultant landlessness of the allotment policy's intended beneficiaries. The Indian Reorganization Act of 1934 was part of a period in which tribal autonomy was actively promoted. Another assimilationist chapter in American Indian history resulted in the Termination Acts of the 1950's, pursuant to which numerous tribes were officially disbanded and their reservation land divided among tribal members. Finally, the period since the 1960's has been a time in which tribal self-sufficiency has largely been reaffirmed and extended. (See generally Cohen, *supra,* pp. 129-188.)

B. *Legislative History and Intent of Section 1360*

Public Law number 280, of which section 1360 is part, was enacted by Congress in 1953 (67 Stat. 588) during an assimilationist period. It grants

both civil and criminal jurisdiction over Indian country to six designated states, including California, and permits other states the option of assuming similar jurisdiction. The primary focus of the legislative history of Public Law number 280 is on section 2 (codified in 18 U.S.C. § 1162), which grants criminal jurisdiction. House Indian Affairs Subcommittee member Wesley D'Ewart cited as the impetus for Public Law number 280, "[t]he complete breakdown of law and order on some reservations . . . ." (Hearings Before the House Subcom. on Indian Affairs on H.R. No. 459, H.R. No. 3235, & H.R. No. 3624, 82d Cong., 2d Sess., ser. 11, at p. 14 (1952).) The lack of attention to the civil jurisdiction provision, Public Law number 280, section 4 (codified in 28 U.S.C. § 1360), has led one commentator to conclude that such jurisdiction was "an afterthought . . . added because it comported with the pro-assimilationist drift of federal policy . . . ." (Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians* (1975) 22 U.C.L.A. L.Rev. 535, 543 (hereafter Goldberg).)

Little legislative history concerning section 1360(b) exists. (See *Heffle* v. *State* (Alaska 1981) 633 P.2d 264, 268, fn. 5.) What is known is that Public Law number 280 passed despite considerable opposition from Indian organizations, which feared "state jurisdiction would in practice operate to the disadvantage of the Indians. The Indians in many instances preferred federal to state jurisdiction because the [Bureau of Indian Affairs], for all its faults, at least perceived the Indians as its special responsibility and concern." (Goldberg, *supra*, 22 U.C.L.A. L.Rev. at p. 545.) Perhaps because of this opposition, Public Law number 280, in its final form, represented "an attempt at compromise between wholly abandoning the Indians to the states and maintaining them as federally protected wards, subject only to federal or tribal jurisdiction." (*Id.* at p. 537.)

Section 1360(b) is central to that compromise, and "may be read as simply a reaffirmation of the existing reservation Indian-Federal Government relationship in all respects save the conferral of state-court jurisdiction to adjudicate private civil causes of action involving Indians." (*Bryan* v. *Itasca County* (1976) 426 U.S. 373, 391 [48 L.Ed.2d 710, 722-723, 96 S.Ct. 2102] (hereafter *Bryan*).) This "reaffirmation of the existing reservation Indian-Federal Government relationship" was accomplished by excepting from the grant of jurisdiction to the states any power to legislate on, or adjudicate matters pertaining to, land held by the United States in trust for the Indians. Thus, the exclusion of the states from acts leading to the "alienation, encumbrance or taxation" of Indian land has been construed to prohibit application of local zoning ordinances to such land (*Santa Rosa Band of Indians* v. *Kings County* (9th Cir. 1975) 532 F.2d 655) and taxation of individual Indian reservation dwellings (*Bryan, supra*, 426 U.S. 373).

Because Public Law number 280 was passed at the same time as various Termination Acts cited above, they are to be read in pari materia. (*Menominee Tribe* v. *United States* (1968) 391 U.S. 404, 411 [20 L.Ed.2d 697, 702, 88 S.Ct. 1705].) The enactment of the Termination Acts makes it clear that Congress "knew well how to express its intent directly when that intent was to subject reservation Indians to the full sweep of state laws and state taxation," and Public Law number 280 was plainly not intended for that purpose. (*Bryan, supra,* 426 U.S. at p. 389 [48 L.Ed.2d at p. 721].)

■ Section 1360(b)'s jurisdictional bar should also be read in conjunction with the grant of federal jurisdiction to adjudicate Indian allotment claims (25 U.S.C. §§ 345-346), which the United States Supreme Court has interpreted as exclusive of state court jurisdiction. (*McKay* v. *Kalyton* (1907) 204 U.S. 458 [51 L.Ed. 566, 27 S.Ct. 346].) Both 28 United States Code section 1360(b) and 25 United States Code sections 345-346 embody the principle that the exclusive federal-Indian trust relationship is best maintained by channelling all disputes about such land into federal court.

C. *Section 1360(b)'s Jurisdictional Bar and Its Application to the Present Case*

Imperial's request for relief may be divided into three categories: (1) declaratory and injunctive relief affecting the Indian defendants' use of what such defendants claim is Indian trust land, (2) declaratory and injunctive relief, as well as damages, against non-Indians relating only to use of what all parties concede is non-Indian land, and (3) damages against the Indian defendants for acts committed on non-Indian land. We shall consider each in turn.

1. *Relief Against Indian Defendants That Will Affect Alleged Indian Land*

■ Imperial's position appears to be that the road in question is manifestly public, and that, although it runs through Indian territory, it is not subject to Indian control. The trial court apparently based its denial of the Indian defendants' motion to dismiss on a finding that the road was indeed public.

The Court of Appeal's reason for upholding state court jurisdiction was somewhat different from that advanced by Imperial or the trial court. First, the Court of Appeal conceded that it was unable to determine, on the present record, whether the road in question was public or, in fact, was part of Pala Indian trust land. Next, the Court of Appeal conceded that a state court may not assert jurisdiction over a lawsuit in which the underlying

disputed property is admittedly Indian trust land and the only issue is the adjudication of nonpossessory rights to the property, such as easement rights. It held however, that if there is a *possibility* that the road is public, or is explicitly placed by the federal government under the jurisdiction of the state, then a state court may accept jurisdiction to determine the status of the road. If the court then finds the road to be public and state controlled, the court may assert its full jurisdiction to adjudicate the merits of the complaint.

More specifically, the Court of Appeal reasoned as follows: (1) if there is a possibility that the road running through Indian territory is a public road, subject to state law, then a state court may provisionally assume jurisdiction of the complaint; (2) there are federal statutes, including two discussed below—25 United States Code sections 311 and 323—that provide for the construction of public roads, subject to state law, across Indian territory, and it is possible that their provisions apply to the present dispute; (3) therefore, the state court may provisionally assume jurisdiction of the case.

To begin with, it is questionable whether the statutes cited by the Court of Appeal—25 United States Code sections 311 and 323—are applicable to this case. Section 311 authorizes the Secretary of the Interior to grant permission to open public highways through Indian reservation land "in accordance with the laws of the State . . . in which the lands are situated." This provision has been construed to permit states to apply their own law to the operation as well as to the establishment of highways constructed pursuant to this provision. (*U.S.* v. *Oklahoma Gas Co.* (1943) 318 U.S. 206 [87 L.Ed. 716, 63 S.Ct. 534].) Section 323 authorizes the Secretary of the Interior to grant rights-of-way across Indian trust land. Nowhere in Imperial's complaint or elsewhere in the sparse record before us, however, is it suggested that there has been a grant by the Secretary of the Interior or that either of these statutes applies to the present case.

But even if Imperial did make such a claim, the major premise of the Court of Appeal's reasoning remains fallacious: section 1360(b) precludes states from asserting jurisdiction over *disputes* concerning Indian land, including—as here—disputes in which one party claims the disputed property is non-Indian. As will appear, in order for section 1360(b)'s jurisdictional preclusion to operate and its protective purpose to be fulfilled, the threshold question must be whether one possible outcome of the litigation is the determination that the disputed property is in fact Indian trust land. If that outcome is possible, then a state court is barred from assuming jurisdiction of the case. The reasons for construing the statute in this manner derive from the canons of construction for Indian statutes and treaties in general,

from the language of the statute itself, and from the evident purpose of the statute.

■ We look first to the canons of construction of statutes concerning Indians. The primary principle for construing statutes such as section 1360, that were " 'passed for the benefit of dependent Indian tribes,' " is that they " 'are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' " (*Bryan, supra,* 426 U.S. at p. 392 [48 L.Ed.2d at pp. 722-723].) This principle is but a variant of the long-held canon that Indian treaties are to be construed "as far as possible . . . in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." (*Tulee* v. *Washington* (1942) 315 U.S. 681, 684-685 [86 L.Ed. 1115, 1120, 62 S.Ct. 862]; see also Cohen, *supra,* at pp. 223-224.)

■ With this principle in mind, we proceed to the text of section 1360(b) (fn. 4, *ante*). The language plainly supports the position that state court jurisdiction is barred whenever one litigant claims the disputed property is Indian trust land. The statute plainly declares that section 1360(a)'s general grant of civil jurisdiction to the states does not include the jurisdiction "to adjudicate . . . the ownership or right to possession of [Indian] property or any interest therein." Such language cannot be understood to apply merely to disputes about nonpossessory rights to indisputably Indian property, and it does not differentiate between particular types of ownership disputes. The use of the broad term "ownership" signifies that one class of disputes barred from state court jurisdiction is that in which one side claims that the disputed property is Indian land and the other side claims the contrary. This is such a case.

An alternative construction of section 1360(b), which neither the Court of Appeal nor Imperial specifically proposes, might be that the term "ownership" applies only to disputes between Indians about what both sides concede to be Indian land. Even if this construction were an equally plausible reading of the statute, however, it would be the construction less consistent with the maintenance of protective federal supervision over Indian land interests and therefore disfavored under the decisions cited above. Moreover, canons of construction aside, the broader construction seems more in harmony with the sweeping language of section 1360(b) itself: by excepting from state jurisdiction the right to adjudicate "ownership, or right to possession . . . *or any interest*" in Indian property (italics added), the statute seems intent on comprehensively excluding from state courts the whole class of cases involving Indian property rights, including ownership disputes in any form involving Indian trust land.

Finally, the validity of that construction is confirmed by the evident purpose of section 1360(b). ■ As stated in *Bryan, supra,* 426 U.S. at

page 391 [48 L.Ed.2d at pages 722-723], Congress intended section 1360(b) to help preserve the property base of the reservation system. One cornerstone of that system is the exclusive and protective federal jurisdiction over Indian trust land and Indian allotments, and the requirement of prior federal approval for any alienation of Indian property in order to prevent the loss of reservation land to market forces and state taxation. Section 1360(b) seeks to maintain that protective exclusivity by denying to states the ability both to legislate concerning Indian property and to adjudicate disputes involving that property. This exclusivity would hardly be maintained if state courts were allowed to assert concurrent jurisdiction over certain kinds of ownership disputes because of the mere possibility—denied by the Indian party—that the federal government had ceded control of the disputed property to the state. It would be strange indeed if section 1360(b) precluded state courts from removing any stick from the bundle of Indian property rights except the most substantial one—that of ownership. State courts would then be able to redraw the map of Indian property and, by device, breach the exclusive federal-Indian relationship over Indian trust land.

Put another way, different constructions of section 1360(b) permit different types of jurisdictional error to occur more frequently. Under the broader construction of section 1360(b) that we adopt, certain types of ownership disputes that are in reality nothing more than ordinary state-law property disputes may be initially and temporarily shunted into federal court, because of erroneous claims that the land in question is Indian trust land. The federal court, of course, may transfer the matter to state court. Under the narrower construction of the statute urged by Imperial, however, certain cases will be erroneously decided in state court, both with respect to the subject matter jurisdiction of the court itself and the merits, by mistakenly denying valid claims of Indian parties. Given its intent to preserve federal authority over Indian trust land by operation of section 1360(b), it seems evident that, if error there is to be, Congress preferred the first type to the second.

Thus, it makes no difference if a plaintiff claims that the land is owned by himself, by the state, or is under state jurisdiction by virtue of federal government action. As long as the Indian party to the litigation claims that the property is Indian trust or allotted land, the dispute may be characterized as one concerning ownership and possession of Indian land, and is therefore barred from state court jurisdiction.

We have no difficulty in distinguishing *U.S.* v. *Oklahoma Gas Co.*, *supra*, 318 U.S. 206, cited by the Court of Appeal for the proposition that highways constructed pursuant to 25 United States Code section 311, discussed above, are to be governed by state law. In that case, both sides conceded

that section 311 applied to the road in question; here neither side alleges the applicability of the statute. Indeed, if Imperial were to so allege the Indian defendants would no doubt deny it, because such applicability is inconsistent with their position that the Pala Band has sole dominion over the portion of the road running through its property. Such a dispute over the applicability of section 311—that is, of the ability of the state to control a road running through Indian territory—is precisely the kind of controversy over ownership, possession, or other interests in Indian land that section 1360(b) precludes state courts from adjudicating.[5]

At least one other court has concluded that section 1360(b) applies to underlying ownership claims of Indian land against state assertions of ownership and control. In *State of Alaska, Dept. of Public Works* v. *Agli* (D.Alaska 1979) 472 F.Supp. 70, the State of Alaska brought quiet title and ejectment actions in state court against Eskimos occupying land that Alaska claimed had been conveyed to it by the federal government. The Eskimos claimed the property belonged to them under the Alaska Native Allotment Act of 1906 (former 43 U.S.C. §§ 270-1 to 270-3 [repealed 1971]). The Eskimos attempted to remove the dispute to federal court, and the federal court was required to determine whether the state court had properly asserted jurisdiction *ab initio*. Although on the face of the complaint the action involved only state-law claims, the court looked " 'beyond the verbiage of the state court complaint to the substance of plaintiff's claimed grievance.' " (472 F.Supp. at p. 72.) The court concluded that the state court had been asked in essence to adjudicate the validity of a native ownership claim, which section 1360(b) barred it from doing. (472 F.Supp. at pp. 73-74; see also *Heffle* v. *State, supra,* 633 P.2d 264 [claim of state-created easement in Indian road must be adjudicated in federal court].)

Imperial also argues that because the road running through Indian property is manifestly non-Indian, the rule that Indians have little right to assert jurisdiction over non-Indian property within the borders of the reservation bars the Indians from interfering with any portion of the dirt road. (See *Montana* v. *United States* (1981) 450 U.S. 544 [67 L.Ed.2d 493, 101 S.Ct. 1245]; *Brendale* v. *Confed. Tribes & Bands of Yakima Indian Nation* (1989) 492 U.S. 408 [106 L.Ed.2d 343, 109 S.Ct. 2994].) As already discussed at length, however, this contention assumes as true precisely those jurisdictional facts that are in dispute; thus it cannot be the basis for assuming jurisdiction under section 1360(b).

---

[5] Nor was *U.S.* v. *Oklahoma Gas Co., supra,* 318 U.S. 206, a case that involved the construction of section 1360. We do not decide today the relation between 25 United States Code section 311 and 28 United States Code section 1360 in cases in which it is *undisputed* that section 311 applies to a given highway. Whether section 311 is in fact applicable to the present case is left to a federal court to decide, and to return to state court if deemed appropriate.

Finally, we undertake to formulate the threshold test that our state courts should use to determine whether they have jurisdiction to adjudicate a property dispute involving an Indian party. ■ The general rule is that subject matter jurisdiction is determined from the face of a well-pleaded complaint. (*Oneida Indian Nation* v. *County of Oneida, supra,* 414 U.S. at p. 676 [39 L.Ed.2d at p. 84].) When the complaint is in an area completely preempted by federal law, the well-pleaded complaint rule is supplemented, with regard to federal-question jurisdiction, by the "complete preemption doctrine." Under that doctrine, it is settled that "once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." (*Caterpillar, Inc.* v. *Williams* (1987) 482 U.S. 386, 393 [96 L.Ed.2d 318, 328, 107 S.Ct. 2425].) The United States Supreme Court has specified that Indian property law is one area in which the "complete preemption doctrine" is applicable. (*Id.* at p. 393, fn. 8 [96 L.Ed.2d at p. 328].)

In the case of section 1360(b) the concern is not whether a federal question exists that would allow a federal court to assume jurisdiction, but rather whether a dispute over Indian land exists within the meaning of section 1360(b) that would bar state court jurisdiction. ■ Therefore, whenever a party claims that the state court has no subject matter jurisdiction under section 1360(b), it is incumbent on the state court, as in the case of areas of law completely preempted, to look beyond the face of the complaint in order to determine from the totality of the pleadings whether the case before it is a dispute over the "ownership or right to possession [of Indian land] or any interest therein." If it appears from the pleading that the case may be so characterized, and that one possible outcome of the case may be a finding that the property in dispute is Indian trust land, the court must dismiss the case for want of subject matter jurisdiction.

■ Applying this standard here, we find it evident from the pleadings that at least part of this dispute is about the "ownership or right of possession" of Indian land, as well as a dispute about interests in such land. The facts alleged in the complaint and in the motion to dismiss—i.e., that the road runs through what both sides concede to be Indian land and that there is a factual dispute about whether the road is public—make it clear that the dispute concerns Indian property rights. Thus, as we shall elaborate below, that part of the complaint that asks for the adjudication of rights to purportedly Indian land—i.e., requests for declaratory and injunctive relief that would affect the right, title or use by the Indian defendants of those portions of the contested road running through parcels 2 and 4—cannot be adjudicated by a court of this state.

### 2. *Acts by Non-Indians on Non-Indian Land*

No party claims that section 1360(b) bars liability of the non-Indian defendants (the Bradfords) for actions taken on non-Indian property, and, indeed, the Bradfords did not join the Indian defendants' motion to dismiss. Therefore, the state court may adjudicate the question whether an injunction should issue to remove the gate welded shut over the portion of the road that traverses the Agua Tibia Ranch, as well as the claim of damages against the Bradfords for such an obstruction.

### 3. *Acts by Indians on Non-Indian Land*

Imperial also alleges that the Indian defendants acted in concert with the non-Indian defendants (the Bradfords) to obstruct the portion of the road running through the Agua Tibia Ranch. The question whether the Indian defendants acted tortiously on concededly non-Indian land does not require a determination of Indian property rights. Therefore, the damage claim against the Indian defendants for actions taken outside the reservation is not barred by section 1360(b). Whether it is barred by the sovereign immunity of the Indian defendants as officers of a recognized Indian tribe, as they contend, is a separate question to which we now turn.

## II. SOVEREIGN IMMUNITY

Although Indian tribes enjoy broad sovereign immunity from lawsuits, the immunity of Indian tribal officials, such as these defendants, is more limited. (See *Santa Clara Pueblo* v. *Martinez* (1978) 436 U.S. 49, 59 [56 L.Ed.2d 106, 115-116, 98 S.Ct. 1670] [tribal officials may be sued for violation of civil rights although the tribes themselves are immune].) In general, the agent of a sovereign may be held liable when he acts " 'in excess of his authority or under an authority not validly conferred.' " (*Larson* v. *Domestic & Foreign Corp.* (1949) 337 U.S. 682, 691 [93 L.Ed. 1628, 1636, 69 S.Ct. 1457].) The commission of a tortious act is not per se exempt from immunity. "[I]f the actions of an officer do not conflict with the terms of his valid statutory authority, then they are actions of the sovereign, whether or not they are tortious under general law . . . ." (*Id*. at p. 695 [93 L.Ed. at p. 1639].) This general principle of sovereign immunity has been applied to Indian sovereign immunity. (See, e.g., *Tenneco Oil* v. *Sac & Fox Tribe of Indians of Okl.* (10th Cir. 1984) 725 F.2d 572, 574.)

In the case at bar it is alleged that the Indian defendants conspired to commit tortious actions on non-Indian land. Any discussion of sovereign immunity in this context must begin with the principle that the authority of a tribal government to act beyond the confines of its own

territory is severely circumscribed. "[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." (*Montana* v. *United States, supra*, 450 U.S. at p. 564 [67 L.Ed.2d at pp. 509-510].) In the cited decision the United States Supreme Court held that Indian tribes could not regulate hunting and fishing on non-Indian lands, although the lands were within the boundaries of the Indian reservation. (See also *Brendale* v. *Confed. Tribes & Bands of Yakima Indian Nation, supra*, 492 U.S. 408 [Indians may not impose land use regulations on non-Indian land within reservation boundaries].) The sovereign power of Indian tribes to act on land that is neither tribal land nor within the confines of the reservation is a fortiori minimal.

Indian tribes may of course exercise sovereign power over non-Indians who enter tribal land. (See *Williams* v. *Lee* (1959) 358 U.S. 217, 223 [3 L.Ed.2d 251, 255-256, 79 S.Ct. 269].) They may also exercise control of their boundaries, and exclude those seeking access. (*Merrion* v. *Jicarilla Apache Tribe* (1982) 455 U.S. 130, 144 [71 L.Ed.2d 21, 33-34, 102 S.Ct. 894]; *Babbitt Ford, Inc.* v. *Navajo Indian Tribe* (9th Cir. 1983) 710 F.2d 587, 592.) This power to exclude, however, does not extend to actions taken beyond the confines of the reservation. (See, e.g., *Babbitt Ford, Inc., supra*, at pp. 592-593.)

■ From the present record, however, we are unable to determine whether the alleged tortious or conspiratorial acts by the Indian defendants are beyond the scope of tribal self-government. If their acts were nothing more than those appropriate for excluding Imperial from tribal territory, and were taken within tribal boundaries, the Indian defendants acted with the scope of their sovereign immunity. If, however, they committed or conspired to commit tortious acts the primary situs of which was outside Indian territorial boundaries, they have acted beyond their sovereign authority and are not protected by sovereign immunity. Determination of the sovereign immunity issue thus requires a greater elaboration of the facts that underlie Imperial's allegations, in further proceedings at the trial court level.

## CONCLUSION

In sum, the trial court should have granted the Indian defendants' motion to dismiss all claims of Imperial's rights in that portion of the road that runs through parcels 2 and 4, which are Indian trust territory. Such claims include Imperial's request for declaratory relief, which asks the court to decide broad possessory and nonpossessory rights to the road as a whole, as

well as its request for prospective injunctive relief that would forbid the Pala Band from "interfering" with the use of the portion of the road running through its territory. Imperial may pursue its request for injunctive relief against the Bradfords, however, and may maintain its action for damages against both the Bradfords and against the Indian defendants, inasmuch as the latter are alleged to have conspired with the Bradfords to erect the obstruction to the road on non-Indian land.

The judgment of the Court of Appeal is affirmed in part and reversed in part, and the cause is remanded to the Court of Appeal with directions to partially grant the petition for a writ of mandate in a manner consistent with this opinion.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.