[No. A094872. First Dist., Div. Five. Aug. 14, 2002.]

FRIENDS OF EAST WILLITS VALLEY et al., Plaintiffs and Respondents, v.
COUNTY OF MENDOCINO, Defendant and Respondent;
SHERWOOD VALLEY RANCHERIA, Real Party in Interest and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Rapport and Marston and David J. Rapport for Real Party in Interest and Appellant.

Brandt-Hawley & Zoia and Rose M. Zoia for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

OPINION

GEMELLO, J.—This case presents an apparent conflict between a Native American tribe's desire to build low-income homes for its members and Willits Valley residents' efforts to preserve open space for agricultural uses. The Mendocino County Board of Supervisors voted to grant the Sherwood Valley Rancheria's request for cancellation of Williamson Act agricultural use restrictions on land the tribe sought to develop. It issued a negative declaration that the tribe's limited project would have no significant environmental impacts. The trial court issued a peremptory writ of mandate directing Mendocino County to set aside its approvals. Because we conclude that the decision to adopt a negative declaration was permitted as a matter of law and the decision to cancel the agricultural use restrictions was supported by substantial evidence, we reverse.

BACKGROUND

The Sherwood Valley Rancheria (Tribe) consists of approximately 400 members of the Pomo Indian tribe. The Willits Valley is its aboriginal territory. Its existing land is insufficient to provide homes for the current members of the Tribe; approximately 40 families are now on a waiting list for adequate housing. The Tribe has obtained a community development grant from the United States Department of Housing and Urban Development (HUD) for use in acquiring additional land and constructing additional homes.

In May 1997, after approximately two years of searching unsuccessfully for suitable additional land, the Tribe settled on acquiring the Bettansid Ranch (Ranch), a 160-acre parcel two and one-half miles east of Willits, California. The Tribe intended to convey the Ranch to the federal government in trust for the Tribe and then construct 15 low-income homes on three and one-half acres of the property.

The Ranch consists of two distinct regions. The flat valley bottomland portion, approximately 53 acres to the west of East Side Road, is prime agricultural land when irrigated. However, it has not been actively farmed since 1995. The hilly upland portion, approximately 107 acres to the east of East Side Road, has never been considered prime agricultural land. The Tribe's plan calls for constructing homes in a cluster in this upland portion of the Ranch, reforesting the remainder of the upland side, and planting orchards in the bottomlands.

Since 1971, the Ranch has been the subject of a Williamson Act contract between the County of Mendocino (County) and the Ranch's owners, Bettansid Ranch, Inc. The Williamson Act establishes a mechanism for saving agricultural land by allowing counties to create agricultural preserves and then to enter into contracts with landowners within those preserves. (Gov. Code, § 51200 et seq.) A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. (*Id.*, §§ 51240-51244.) Absent contrary action, each year the contract renews for an additional year, so that the use restrictions are always in place for the next nine to 10 years. (*Id.*, § 51244.)

Three methods exist for terminating a Williamson Act contract. The county or the landowner may give notice of nonrenewal, in which case automatic renewal will cease and the contract will expire at the end of its remaining term. (Gov. Code, §§ 51245, 51246.) Alternatively, the landowner may petition the county for cancellation of the contract, and the county may

approve the petition upon finding that cancellation is in the public interest or is consistent with the purposes of the Williamson Act. (*Id.*, §§ 51280-51282.) Finally, the government may institute eminent domain proceedings. A taking nullifies the contract. (*Id.*, § 51295.)

As a condition of the release of any funds, HUD required that the Williamson Act restrictions on use of the Ranch be lifted. In September 1997, Bettansid Ranch, Inc., and the Tribe jointly applied to the County for cancellation of the Williamson Act contract. Also in September 1997, Bettansid Ranch, Inc., gave notice of nonrenewal of the Williamson Act contract. Consequently, absent cancellation, the Williamson Act restrictions would expire in 2006 or 2007.

The Tribe commissioned an analysis of the environmental impacts of Williamson Act cancellation and construction of the planned homes (the Project) in order to comply with the National Environmental Policy Act and HUD's requirements for use of grant money. In addition, the Tribe commissioned a report on biological resources and a report on archaeological resources. We refer to the environmental, biological, and archeological reports collectively as the "Environmental Assessment." The Environmental Assessment concluded that the Project would not result in any significant environmental impacts provided that several small archaeological sites were avoided in construction.

On November 18, 1997, the Mendocino County Lands Program Committee voted two to one to recommend approval of the cancellation. The dissenting member expressed concerns that the Project would induce further growth both on-site and in the surrounding area.

The County Department of Planning and Building Services (Planning Staff) subsequently prepared an initial study of environmental impacts. The initial study reported no impacts on traffic flow, drainage, water resources, or growth rates. It did identify issues concerning archaeological and natural resources. The initial study concurred with the conclusion of the Environmental Assessment that so long as development avoided the archaeological sites on the Ranch, there would be little impact on archaeological resources. As for natural resources, the initial study concluded that the Project would result in a reduction in acreage for agricultural crops and an alteration of an agricultural resource protection zone. The Planning Staff viewed any voluntary agreement by the Tribe not to develop the 53 acres of bottomland as unenforceable. Because of this impact, and because the Planning Staff believed findings related to general plan consistency were required and

could not be made, the Planning Staff recommended denial of cancellation. Nevertheless, in the event the planning commission or board of supervisors ultimately approved the Project, the Planning Staff prepared a draft negative declaration.

On March 16, 1998, influenced by the initial study's concerns about a loss of agricultural land, the Agricultural Commissioner, one of the Lands Program Committee members who had voted for cancellation, reversed his recommendation. On March 19, 1998, concurring with the recommendations of its staff, the planning commission voted to deny the petition for cancellation.

The Tribe appealed to the Mendocino County Board of Supervisors (Board of Supervisors). On April 13, 1998, the Board of Supervisors held a lengthy public hearing and voted four to one to adopt a negative declaration that cancellation and subsequent development would have no significant environmental impacts. It also tentatively approved the cancellation application and scheduled a further hearing to follow circulation of documents to various state agencies. In July 1998, the Board of Supervisors confirmed its tentative decision and granted the Tribe's petition to cancel the Williamson Act contract by a three-to-two vote.

A critical factor underlying the approvals was the Tribe's submission of a proposed Tribal/County Land Use Agreement (Tribal/County Agreement). The Tribal/County Agreement, signed on April 13, 1997, and subsequently recorded as a covenant running with the land, obligated the Tribe to comply with the terms of the prior Williamson Act contract on the 53-acre bottomland portion of the Ranch until September 30, 2007. The Tribe also agreed to waive its sovereign immunity for the limited purpose of allowing the County to seek specific enforcement of the Tribal/County Agreement. The Tribal/County Agreement included as a condition precedent that the County cancel the Williamson Act restrictions.

Within one month of approval of the Project, this lawsuit followed. A group of local residents calling themselves Friends of East Willits Valley (Friends) brought a mandamus action to challenge the County's adoption of a negative declaration under the California Environmental Quality Act (CEQA) and cancellation of the Williamson Act contract. Bettansid Ranch, Inc., and the Tribe were named as real parties in interest. In a prior unpublished decision, we rejected initial challenges to trial court jurisdiction over the Tribe, concluding that because the Tribe had made a general appearance, it waived its sovereign immunity.

After full briefing and a hearing, the trial court granted the petition for a writ of mandamus. It concluded that substantial evidence prevented the County from adopting a negative declaration and required it to prepare an environmental impact report. It further held that no substantial evidence supported the decision to grant Williamson Act cancellation and that the grant of cancellation was therefore an abuse of discretion. It also reversed the County's findings of consistency with its own general plan. The Tribe has timely appealed.

During the pendency of this appeal, the Tribe applied to the Bureau of Indian Affairs (BIA) to have the Ranch accepted into trust by the United States.[1] The BIA granted an initial approval. Friends appealed to the Department of Interior's Board of Indian Appeals, notifying it of this proceeding and asking that approval be denied, but its appeal was denied for lack of standing. On April 25, 2002, the BIA issued a final determination accepting the Ranch into trust, and on June 3 the Tribe conveyed title to the Ranch to the United States in trust for the Tribe.

## DISCUSSION

I. *This Case Is Not Moot Because Passage of the Ranch into Trust Does Not Void the Williamson Act Restrictions*

The BIA's acceptance of the Ranch as federal trust land during the pendency of this appeal makes it necessary for us to consider the fundamental issue of jurisdiction. The Tribe contends that the BIA's action voids the Williamson Act restrictions as a matter of either state law (Gov. Code, § 51295) or federal law (28 U.S.C. § 1360) and that we therefore need not decide whether the County's cancellation of the restrictions was valid. In the alternative, the Tribe argues that the BIA's action conclusively deprives this court and future courts of jurisdiction to enforce the restrictions. We disagree. Neither state nor federal law voids the Williamson Act contract at issue here; neither state nor federal law prevents the Tribe from waiving its immunity and acceding to jurisdiction. This case presents a live controversy that we must resolve.

A. *Section 51295 Does Not Void the Williamson Act Restrictions Because It Applies Only to Eminent Domain Actions*

As we interpret Government Code section 51295, it does not apply here. Section 51295 provides in part: "When any action in *eminent domain* for the

---

[1]The Tribe has filed two requests that we take judicial notice of BIA documents evidencing the BIA's actions. We granted the first request previously by separate order, and we now grant the second request as well. (Evid. Code, §§ 452, subd. (c), 459.)

condemnation of the fee title of an entire parcel of land subject to a [Williamson Act] contract is filed, or when that land is acquired in lieu of eminent domain for a public improvement by a public agency or person, or whenever there is any *such action or acquisition* by the federal government," the Williamson Act contract will automatically terminate. (Gov. Code, § 51295, italics added.) "Such action or acquisition" refers back to those specific actions and acquisitions defined in the first clause of the statute, i.e., condemnation actions under the eminent domain power or acquisitions negotiated under threat of institution of a condemnation action. The Legislature did not provide that any federal acquisition terminated Williamson Act restrictions, only acquisitions through or under threat of the exercise of federal eminent domain powers. The Tribe's voluntary transfer of title and the federal government's acceptance of that title in trust is not the involuntary taking contemplated by the statute and does not automatically terminate the restrictions on the Ranch under Government Code section 51295.

The Tribe contends that the federal acquisition of the Ranch was for a public use, low-income housing for the Tribe, and that this acquisition is analogous to an eminent domain taking and should trigger cancellation under Government Code section 51295. (See *State of Minnesota v. United States* (8th Cir. 1942) 125 F.2d 636, 640-641 [use of government land for Native American housing is public use].) Essentially, the Tribe argues that the federal government could have acquired the Ranch by actual or threatened use of its eminent domain powers, even though it did not. Whether this is so we need not decide. Government Code section 51295 does not require the courts to exercise such hindsight; it is triggered only when specified procedures are in fact used for acquisition.

The Tribe's implicit argument, that exercise of the trust power can be read into Government Code section 51295 as an alternate basis for termination, also does not withstand analysis. The federal government's power to take land through eminent domain and its power to hold lands in trust for Native American individuals or tribes are historically distinct both in their constitutional underpinnings and their application. The eminent domain power is a long-acknowledged fundamental incident of sovereignty. (*United States v. Carmack* (1946) 329 U.S. 230, 236 [67 S.Ct. 252, 255, 91 L.Ed. 209] ["The power of eminent domain is essential to a sovereign government"]; *Kohl et al. v. United States* (1875) 91 U.S. 367, 371-372 [23 L.Ed. 449, 451] ["The right [of eminent domain] is the offspring of political necessity; and it is inseparable from sovereignty"]; see U.S. Const., 5th Amend.) In contrast, the trust power finds its roots in *Johnson v. McIntosh* (1823) 21 U.S. (8 Wheat.) 543 [5 L.Ed. 681], which declared that the government held title to all lands

as successor to colonial explorers, who acquired title by right of discovery. (*Id.* at p. 574 [5 L.Ed. at pp. 688-689].) According to Chief Justice Marshall, the act of discovery displaced the inhabitants' right of ownership, though not their right of possession. (*Ibid.*) Subsequent judicial decisions have concluded that the federal government may hold lands in trust for Native Americans as an incident of this title. (*Santa Rosa Band of Indians v. Kings County* (9th Cir. 1975) 532 F.2d 655, 666, fn. 19; *Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1148 [276 Cal.Rptr. 62, 801 P.2d 305].) The eminent domain power and the trust power are different in application as well. A taking pursuant to eminent domain necessarily rests on a prior finding that the land is needed for a public purpose. (*Hawaii Housing Authority v. Midkiff* (1984) 467 U.S. 229, 241 [104 S.Ct. 2321, 2329-2330, 81 L.Ed.2d 186]; U.S. Const., 5th Amend.) In contrast, acceptance of land into trust may be, but need not be, for the public's benefit. (See 25 C.F.R. §§ 151.10, 151.11 (2002) [considerations involved in trust acceptance].) Nothing in the language of Government Code section 51295 suggests that the Legislature intended for termination to be triggered by exercise of this fundamentally different federal power. We conclude that acquisition pursuant to the trust power does not terminate the Williamson Act restrictions under Government Code section 51295.

### B.  *Federal Law Does Not Preempt Jurisdiction over This Transaction*

In the alternative, the Tribe argues that federal law preempts the contractual Williamson Act restrictions. ■ The federal government has "the plenary and exclusive power" to deal with Native American tribes. (*Bryan v. Itasca County* (1976) 426 U.S. 373, 376, fn. 2 [96 S.Ct. 2102, 2105, 48 L.Ed.2d 710].) This power "derives from federal responsibility for regulating commerce with Indian tribes and for treaty making." (*McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 172, fn. 7 [93 S.Ct. 1257, 1262, 36 L.Ed.2d 129]; see U.S. Const., art. I, § 8, cl. 3; art. II, § 2, cl. 2.) ■ In 1953, Congress passed Public Law No. 280, which granted certain states (including California) limited civil and criminal jurisdiction over Native American matters. (28 U.S.C. § 1360(a).)[2] Section 1360(b) specifies that the grant of jurisdiction is not intended to authorize preempted state or

---

[2]Title 28 United States Code section 1360(a) grants California "jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere in the State[.]" For brevity's sake, we refer to the statute as section 1360 or Public Law No. 280, by which it is also commonly known.

local regulation of Native American property.[3] Courts applying section 1360 consistently have found federal preemption of state and county regulation of trust land. (E.g., *Bryan v. Itasca County, supra,* 426 U.S. 373 [state and county may not impose property tax]; *United States v. County of Humboldt* (9th Cir. 1980) 615 F.2d 1260 [county may not enforce zoning and building codes]; *Santa Rosa Band of Indians v. Kings County, supra,* 532 F.2d 655 [same]; *Middletown Rancheria v. Workers' Comp. Appeals Bd.* (1998) 60 Cal.App.4th 1340 [71 Cal.Rptr.2d 105] (*Middletown Rancheria*) [workers' compensation board may not enforce workers' compensation laws on tribal land].)

However, the federal preemption of involuntary restrictions on tribal land use is not at issue here. The issue is not whether the state or County can regulate the Ranch in the future; it is, instead, whether the Ranch remains subject to voluntarily accepted contractual restrictions. While section 1360 may limit regulation, nothing in its language invalidates contractual commitments made before the passage of land into trust. Indeed, the Tribe and County expressly contemplated that the Ranch would be accepted into trust, and nevertheless entered into an agreement to restrict development after this was accomplished.[4] We hold that federal law does not void prior restrictions on land agreed to before the land passed into trust.

Finally, the Tribe argues that even if the restrictions were to remain in place, they would be unenforceable in the future because Public Law No. 280 precludes jurisdiction over the Tribe. This is an overreading of the statute. It is true that the Tribe enjoys sovereign immunity from suit in state court. (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [98 S.Ct. 1670, 1677, 56 L.Ed.2d 106]; see *United States v. State of Or.* (9th Cir. 1981)

---

[3]Section 1360(b) provides: "Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

[4]The Tribal/County Agreement provides in part: "9. Prior to constructing the houses, the Tribe intends to convey the Property to the United States to be held in trust . . . pursuant to 25 U.S.C. Section 465." Nevertheless, the Tribe agreed "as the owner of the Property in fee or as the beneficial owner, if the Property is accepted in trust" to comply with restrictions on its development of the Ranch, including Williamson Act restrictions: the Tribe shall "continue to be bound by and comply with the provisions of the [Williamson Act] Contract that provided for the exclusion of uses other than agricultural, and other than those compatible with agricultural uses, on the [flat valley bottomland portion] until September 30, 2007, after which time said provisions shall cease to have any further force or effect."

657 F.2d 1009, 1012-1013 ["Indian tribes enjoy immunity because they are sovereigns pre-dating the constitution, and immunity is thought necessary to preserve autonomous tribal existence"].) It is also true that, while Congress may abrogate that immunity and subject tribes to state court jurisdiction, it did not do so when it passed Public Law No. 280: "We have never read Pub. L. 280 to constitute a waiver of tribal sovereign immunity, nor found Pub. L. 280 to represent an abandonment of the federal interest in guarding Indian self-governance." (*Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 892 [106 S.Ct. 2305, 2314, 90 L.Ed.2d 881].)

■ However, congressional authorization and tribal consent are separate and independent bases for jurisdiction. "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit *or the tribe has waived its immunity.*" (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754 [118 S.Ct. 1700, 1702, 140 L.Ed.2d 981], italics added; accord, *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.* (2001) 532 U.S. 411, 418 [121 S.Ct. 1589, 1594, 149 L.Ed.2d 623] [holding that tribe contractually waived sovereign immunity and subjected itself to state court jurisdiction].) "Indian tribes may consent to suit without explicit Congressional authority." (*United States v. State of Or., supra,* 657 F.2d at p. 1013; accord, *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 6 [95 Cal.App.4th 890b, 115 Cal.Rptr.2d 455]; *Middletown Rancheria, supra,* 60 Cal.App.4th at p. 1347; *Hydrothermal Energy Corp. v. Fort Bidwell Indian Community Council* (1985) 170 Cal.App.3d 489, 494-495 [216 Cal.Rptr. 59] (*Hydrothermal Energy Corp.*); see also *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 519 [213 Cal.Rptr. 247, 698 P.2d 150].) ■ Indeed, the Tribe waived sovereign immunity previously when it made a general appearance in this case. It also expressly waived sovereign immunity in connection with enforcement of the Tribal/County Agreement.[5] If a tribe elects to waive sovereign immunity and submit itself to state court jurisdiction, nothing in the language of section 1360 stands as a bar to assumption of that jurisdiction. Consequently, section 1360 does not render restrictions on the Tribe's development of the Ranch unenforceable.

In reaching these conclusions concerning the scope and effect of section 1360 and Government Code section 51295, we accord respect to the public

---

[5]The Tribal/County Agreement provides in part: "3. The Tribe hereby waives its sovereign immunity from unconsented suit and consents to suit by the County of Mendocino in the courts of the state of California within Mendocino County for the limited purpose of specifically enforcing the provisions of this Agreement. The Tribe waives any right it might otherwise have to insist upon exhaustion of tribal court remedies prior to the filing of an action to enforce this Agreement and consents to jurisdiction and venue in Mendocino County."

policies underlying federal Native American law: federal predominance and the promotion of tribal sovereignty and self-determination. (See generally *Boisclair v. Superior Court, supra,* 51 Cal.3d at pp. 1147-1149.) Section 1360 precludes involuntary local regulation of tribal lands; our decision does not alter that rule. Moreover, sovereignty and self-determination are promoted when tribes are free to decide what voluntary agreements they will or will not enter into, and when and under what circumstances they will waive their sovereign immunity and subject themselves to state court jurisdiction. (*Hydrothermal Energy Corp., supra,* 170 Cal.App.3d at p. 494; *United States v. State of Or., supra,* 657 F.2d at p. 1014.) Were we to hold that even voluntary restrictions on land use are automatically voided by the passage of land into trust, or that section 1360 forecloses jurisdiction even when a tribe otherwise voluntarily waives sovereign immunity, the ability of tribes to negotiate and plan would be impeded. (*United States v. State of Or.,* at p. 1014; *Parker Drilling Co. v. Metlakatla Indian Community* (D. Alaska 1978) 451 F.Supp. 1127, 1131.) Here, for example, the Tribe entered into a Tribal/County Agreement in which it both voluntarily accepted land use restrictions and agreed to waive sovereign immunity. (See *ante,* fn. 4 & 5.) The Tribal/County Agreement was predicated on the assumption that the Tribe's concessions would be enforceable. The public policies underlying federal Native American law countenance statutory interpretations that confirm that assumption, thereby preserving for Native American tribes the freedom to judge for themselves what agreements best promote their own welfare.[6]

Because this case is not moot, we turn to the merits: whether the County's cancellation of the Williamson Act restrictions comported with CEQA, the Williamson Act, and general plan consistency requirements.

II.   *The County's Adoption of a Negative Declaration Did Not Violate CEQA\**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[6]In a footnote, the Tribe also contends that the Williamson Act restrictions fail for want of consideration because the Tribe is immune from real property taxes and receives no benefit from the Williamson Act's tax relief. (See *Bryan v. Itasca County, supra,* 426 U.S. at p. 376 [96 S.Ct. at p. 2105].) This argument ignores the nature of Williamson Act contracts. Under such contracts, future restrictions on development are the consideration for present tax benefits. (See *Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 851-852 [171 Cal.Rptr. 619, 623 P.2d 180].) The future restrictions at issue here are (at least in part) the quid pro quo for tax benefits already received by the Tribe's predecessor in interest, Bettansid Ranch, Inc. There is no failure of consideration.

\*See footnote, *ante,* page 191.

### III. *The County Did Not Violate the Williamson Act*

As a second basis for issuing the writ of mandate, the trial court concluded that the County violated the Williamson Act. We review this holding de novo. (*Sierra Club v. City of Hayward, supra,* 28 Cal.3d at p. 849, fn. 2.) In contrast to our analysis of the negative declaration, here we must accord deference to the County's actions. We are limited to reviewing the County's Williamson Act findings for an abuse of discretion. (*Id.* at pp. 849, fn. 2, 850; Code Civ. Proc., § 1094.5, subd. (b).) We will not disturb those findings unless the County "has not proceeded in the manner required by law, the . . . decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) We conclude that the County made the necessary findings and its findings were supported by substantial evidence. Consequently, this ground cannot support issuance of the writ.

#### A. *Findings Required by the Williamson Act*

A county may grant a Williamson Act cancellation petition only after making either of two discrete findings: that cancellation is "consistent with the purposes of [the act]," or that cancellation is "in the public interest." (Gov. Code, § 51282, subd. (a).) Here, the County concluded that cancellation was in the public interest. (*Id.,* § 51282, subd. (a)(2).) That determination requires two subordinate findings: that "other public concerns substantially outweigh[]" the concerns protected by the act, and that no suitable land not subject to a Williamson Act contract is available. (*Id.,* § 51282, subd. (c).)

In the trial court, Friends argued that the County was required to make an entirely different set of findings: that (1) an emergency situation existed (citing *Sierra Club v. City of Hayward, supra,* 28 Cal.3d at pp. 852-853); (2) the Project was contiguous to existing development (citing *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122 [203 Cal.Rptr. 886] (*Honey Springs*)); (3) the Project would not result in adjacent properties being removed from agricultural use (citing Gov. Code, § 51282, subd. (b)(2)); and (4) the Project was consistent with the Mendocino County General Plan. The trial court agreed, and concluded that these findings were not supported by substantial evidence.

However, in light of the statutory structure, we cannot agree that any of these findings are necessary. We do not read *Sierra Club v. City of Hayward, supra,* 28 Cal.3d 840 as requiring a board or council to make a specific finding that an emergency situation exists. Even if it had, however, the

Legislature amended the Williamson Act in direct response to *Sierra Club v. City of Hayward*, passing the Robinson Act in 1981. (See Stats. 1981, ch. 1095, § 8, p. 4254.) It is the Robinson Act's amended version of Government Code section 51282 that now governs, and section 51282, subdivision (f) confines the findings required for cancellation to those "expressly set forth" in section 51282. Section 51282 does not specify an emergency situation finding.

Similarly, the contiguity requirement discussed by *Honey Springs* was part of Government Code former section 51282.1, a set of temporary cancellation requirements that were put in place by the Robinson Act and expired in 1983. The contiguity requirement is still part of Government Code section 51282, subdivision (b)(4), but the findings called for by subdivision (b) only come into play when a board bases cancellation on the alternate finding that cancellation would be consistent with the purposes of the Williamson Act. The County did not do so here. For the same reason, the findings called for by subdivision (b)(2) have no bearing here. Finally, as we will discuss in detail in part IV, *post*, the Williamson Act does not require findings of general plan consistency.

We turn to a consideration of the evidence supporting the two subordinate findings actually required to justify cancellation.

B.   *Public Interest Finding*

The County identified the need for more low-income housing as the public interest supporting cancellation. Substantial evidence supports its conclusion that this interest substantially outweighs the interest in keeping the Ranch under the Williamson Act.

There is no dispute that the provision of low-income housing constitutes a substantial public interest. Federal, state, and local law recognize the significance of this interest. (See 25 U.S.C. §§ 4131-4135 [providing special funding for low-income housing for Native Americans]; Health & Saf. Code, §§ 34201, 50001-50003.3 [declaring promotion of decent low-income housing a matter of state public policy and concern]; Mendocino County General Plan Policy 1.4e [making provision of housing for low-income and special need populations under specified circumstances a County priority].)[11] However, Friends argues that before the County could conclude that that interest

---

[11]Policy 1.4e provides that "[q]ualifying housing projects which substantially advance Housing Element goals or quantified objectives for the production or conservation of housing may be determined to have a higher priority than resource protection, when [particular

was being served here, it first had to determine that the specific findings required by policy 1.4e of its general plan could be made. We disagree. The Williamson Act requires a finding that cancellation would promote other public interests that substantially outweigh the interests underlying the Williamson Act. (Gov. Code, § 51282, subd. (c).) While various federal, state and local statutes and ordinances may stand as evidence of a particular public policy, it does not follow that their provisions are thereby incorporated into the Williamson Act. The County could conclude that the Project promoted its interest in ensuring an adequate stock of low-income housing without concluding that the specific provisions of Mendocino County General Plan Policy 1.4e had been satisfied.[12]

Substantial evidence supports the County's finding that the Project will promote low-income housing. The record establishes that more than 70 percent of Tribe member's households have incomes below 50 percent of the median in the County. More than 40 families are living in substandard or overcrowding housing or housing that consumes more than 30 percent of their income and are on a waiting list for adequate housing. Seventeen families are living on the Tribe's existing lands without electricity and with inadequate water. The County could therefore conclude that the additional homes arising from the Project serve a compelling public need.

Furthermore, the County was entitled to decide that the impact on Williamson Act interests from cancellation would be negligible. Approximately one-third of the Ranch is considered prime agricultural land when properly irrigated. That land is not currently being farmed. Under the terms of the Tribal/County Agreement, the portion of the Ranch that potentially constitutes prime agricultural land will remain subject to Williamson Act restrictions until September 30, 2007, essentially the same period for which such restrictions would have continued to apply in the absence of cancellation. The County therefore could conclude that cancellation would have little, if any, impact on the interests protected by the Williamson Act, and that those interests were substantially outweighed by the need for additional low-income housing.

---

findings related to environmental and growth impacts] can be made by the decision making body . . . ." For a project to substantially advance housing element goals under policy 1.4e, it must provide housing for low-income or special needs households in specified amounts. Policy 1.4e thus recognizes the potentially overriding importance of low-income housing.

[12]Moreover, as we discuss in more detail in part IV, *post*, the Williamson Act, as amended by the 1981 Robinson Act, expressly absolves the County from having to make a finding that cancellation was consistent with its general plan policies.

C. *Absence of Alternatives Finding*

The County also concluded that there was no proximate noncontracted land that was both "available and suitable" for the proposed project. (Gov. Code, § 51282, subd. (c).) Under the deferential standard of review we employ, we find the evidence in the record sufficient to support this finding.

The Tribe submitted a declaration from its realtor, Pamela Baxman, indicating that she had reviewed all properties for sale in the unincorporated Willits and Laytonville area and that only the Ranch was suitable for the Project. Other properties that were otherwise available reportedly had inadequate access, inadequate water, insufficient on-site sewage treatment capacity, or excessive costs associated with acquisition and development. The Tribe supplemented this evidence with a declaration from its chairperson, Robin Phillips, who testified to details of the Tribe's unsuccessful multiyear search for proximate alternatives other than the Ranch. Although Phillips's declaration did not explain why various alternatives were determined to be unsuitable, Phillips supplemented his description of the search in his testimony to the Board of Supervisors, as did the Tribe's attorney. Friends points to no contrary evidence, and our independent review of the record reveals no concrete evidence of viable alternative properties. The County was entitled to credit the statements of both chairperson Phillips and Baxman. (See *Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 986 [63 Cal.Rptr.2d 244].)

Friends criticizes the submissions of Phillips and Baxman as conclusionary. We agree, to an extent. Certainly our job, and that of the County, would have been easier had the Tribe offered substantially more specifics concerning the nature and extent of its search. But the evidence submitted, taken together, discloses at least the minimum information necessary to sustain a finding by the County: the fact that a search for available alternatives was conducted, the fact that the search encompassed the region proximate to the Tribe's current location, the timing and duration of the search, and the fact that criteria permissible under the Williamson Act were used to determine unsuitability and unavailability.

The Tribe concedes that cost played a role in some of its decisions. The Williamson Act properly looks on cost considerations with a jaundiced eye. (Cf. Gov. Code, § 51292 [public improvements may not be placed on Williamson Act parcels based primarily on cheaper cost of such parcels].) If the greater cost of non-Williamson Act land were generally sufficient cause to deem land unavailable, the narrow cancellation exception might well turn

into a four-lane freeway. Here, however, there is specific evidence of irremediable financial constraints. The County was entitled to take those constraints, as well as the public policies served by the Project, into account in determining that unaffordable parcels could be treated as unavailable under the Williamson Act.

Friends also criticizes the search for including other Williamson Act parcels and for apparently confining itself to parcels that were actually offered for sale during the search period. In rural areas such as the Willits Valley, much of the available land may be locked up under Williamson Act contracts. Evidence before the County indicated that at least 75 percent of the properties on the market were under contract. The Tribe investigated alternative Williamson Act and non-Williamson Act sites, conducted environmental reviews, and determined that other sites were unsuitable for development for various reasons. The act requires consideration of all proximate, available non-Williamson Act parcels, but it does not preclude consideration of available Williamson Act parcels. Similarly, the act requires only that a petitioner and county consider "available" properties (Gov. Code, § 51282, subd. (c)), a constraint that means, at a minimum, that a property is available for sale.

From the evidence before it, the County was entitled to find that no proximate and suitable non-Williamson Act land was available. Consequently, its decision to grant cancellation of the Williamson Act contract on the Ranch was lawful.

IV. *Williamson Act Cancellation Does Not Require Findings of General Plan Consistency*

■ Friends contends that the County was required to make findings that the Project is consistent with its general plan, and that it could not do so on this record. The trial court agreed. Because we hold that findings of general plan consistency are not required, we reverse on this ground as well.

In 1981, the Legislature passed the Robinson Act, which substantially revised the Williamson Act. It did so in order to "clarify and make the [Williamson Act] workable in light of problems and ambiguities created by the California Supreme Court decision in the case of Sierra Club v. City of Hayward[, supra,] 28 Cal.3d 840." (Stats. 1981, ch. 1095, § 8, p. 4254.) One of the principal issues debated by the majority and dissent in *Sierra Club* was the extent of any express findings required to grant a petition for cancellation. (Compare *Sierra Club, supra,* 28 Cal.3d at pp. 858-860 (maj. opn. of Mosk, J.) with *id.* at pp. 865-870 (dis. opn. of Richardson, J.).) The *Sierra*

*Club* majority found in the pre-1981 Williamson Act a series of implied required findings; the dissent interpreted the act as mandating only those findings expressly required. (*Id.* at pp. 860, 862 (maj. opn. of Mosk, J.); *id.* at pp. 866-867 (dis. opn. of Richardson, J.).)

In response, the Robinson Act rewrote Government Code section 51282, the statute governing the findings required for cancellation. In the new section 51282, the Robinson Act included a provision expressly delimiting the findings required: "In approving a cancellation pursuant to this section, the board or council shall not be required to make any findings other than or in addition to those expressly set forth in this section, and, where applicable, in Section 21081 of the Public Resources Code." (Gov. Code, § 51282, subd. (f).) In other words, the only findings required for approval of a petition for cancellation are those explicitly stated in section 51282 and those required by CEQA. To imply additional findings would run directly counter to the express language of subdivision (f). Consequently, the County was not required to make any other findings, including findings of general plan consistency.

Other provisions of the Robinson Act make clear that the decision to omit general plan consistency findings was intentional. The Robinson Act included an alternative "window" provision for cancellation applicable only in 1982. (Gov. Code, § 51282.1 [repealed Jan. 1, 1983 by Stats. 1981, ch. 1095, § 9, p. 4254].) This window provision included among the findings required for cancellation the finding "[t]hat the alternative use is consistent with applicable provisions of the city or county general plan . . . ." (Gov. Code, former § 51282.1, subd. (f)(2), repealed by Stats. 1981, ch. 1095, § 3, p. 4252.) The inclusion of this requirement in the temporary cancellation requirements and its omission from the permanent cancellation requirements leaves no doubt that the Legislature intended to eliminate any obligation to make general plan consistency findings.

Because the County was not required to make findings that the Project would be consistent with its general plan, issuance of the writ on the basis of its failure to do so was error.

### DISPOSITION

The County's issuance of approvals for the Project represented the considered judgment of elected officials after reasoned deliberation and evaluation of the available evidence. Having considered each of the bases relied upon by the trial court, we find no legal cause to set aside the County's

decisions. Accordingly, we reverse the judgment of the trial court ordering issuance of a writ of mandate and remand with instructions to deny the petition. The Tribe shall recover its costs on appeal.

Stevens, Acting P. J., and Simons, J., concurred.

The petition of plaintiffs and respondents for review by the Supreme Court was denied November 20, 2002.